*In re* MARRIAGE OF STEVEN EDSEY, Petitioner-Appellee, and LYNNE EDSEY, n/k/a Lynne Yandura, Respondent-Appellant.

First District (6th Division)   No. 1—89—0008

Opinion filed March 30, 1990.—Rehearing denied June 12, 1990.

Richard Gigante, P.C., of Chicago (Paul R. Jenen, of counsel), for appellant.

Kalcheim, Schatz & Berger, of Chicago, for appellee.

JUSTICE LaPORTA delivered the opinion of the court:

This appeal arises out of a determination regarding custody of the minor child and regarding a petition for attorney fees in connection with the judgment of dissolution of marriage of the petitioner, Steven Edsey, and the respondent, Lynne Edsey, n/k/a Lynn Yandura. The trial court awarded physical custody of the parties' eight-year-old son, Douglas, to the petitioner and ruled in petitioner's favor at the close of respondent's case on her petition for attorney fees. Respondent appeals the custody determination regarding Douglas and the ruling on her petition for attorney fees.

The evidence adduced at trial established that the parties were married on March 14, 1971. Steven Edsey, Jr., was born December 6, 1971; David Edsey was born June 3, 1973; and Douglas Edsey was born March 12, 1980. The parties separated on October 4, 1984, and on March 7, 1985, a judgment for dissolution of the marriage was entered. That judgment incorporated the separation agreement between the parties which provided that they were to maintain joint legal custody of the three minor children and that physical custody was to be shared equally. At that time the parties lived within a mile of each other in Park Ridge, Illinois. Petitioner had physical custody of the children on 8 of 14 nights over a two-week period and on alternating weekends. Respondent had physical custody of the children during the weekdays, on the remaining 6 of 14 nights, and on alternating weekends. This visitation schedule was maintained by the parties until May 1986, when respondent moved to Lake Bluff, Illinois.

Respondent began dating her current husband, Gary Yandura, in September 1985, and subsequently sought an order of protection alleging that petitioner had pursued a course of action to harass, abuse, and annoy her. On December 19, 1985, the court entered an agreed order enjoining petitioner from harassing, annoying, or intimidating the re-

spondent. On March 11, 1986, respondent married Gary Yandura, who was employed by the Lake Forest police department and was required to reside within 10 miles of the Lake Forest Public Safety Building. On May 3, 1986, respondent and Yandura moved into a home in Lake Bluff, Illinois, in accordance with the residence restriction imposed by Yandura's employment. Prior to her move to Lake Bluff, respondent asked her two older sons whether they desired to move with her or to stay with their father in Park Ridge. Both boys indicated that they preferred to live with her if she remained in Park Ridge. If she moved to Lake Bluff, however, they wished to live with their father so that they could continue at their present schools and be near their friends. Respondent agreed that the two older boys could remain with their father.

Because Douglas was five years old when respondent moved to Lake Bluff with Yandura, she did not offer Douglas a choice as to where he wanted to live. Although she initially considered having all three boys live with their father, respondent subsequently concluded that Douglas should remain in her care because of his young age. On April 28, 1986, petitioner sought an injunction preventing respondent from removing Douglas from his kindergarten class in the Park Ridge school system prior to the completion of the 1985-86 school year, and the court entered an order requiring respondent to keep Douglas in the Park Ridge school system. The order further required respondent to deliver him to and pick him up from school. In accordance with the court's order, respondent drove Douglas daily to and from his school in Park Ridge from May 1986 until the conclusion of the school term.

During the summer of 1986, all three of the parties' sons lived with respondent in her home in Lake Bluff. In the autumn of 1986, the two older boys returned to their home with their father and resumed school with their classmates in Park Ridge. Douglas remained with respondent and commenced first grade in Central School in Lake Bluff. Respondent was not employed at that time and cared for Douglas before and after school. She also drove Douglas to his father's home in Park Ridge every Friday evening so he could spend the weekend with his father and brothers. On April 30, 1987, petitioner brought his petition seeking sole custody of Douglas.

At the hearing on the petition, petitioner testified that during the weekends, he and Douglas played football together and went to bookstores with the two older boys. They sometimes built things together in the basement or went bicycling or to their farm in Wisconsin, where they had good friends. Douglas also played with his brothers and with his friend, Patrick, who lived in the house next to petitioner's. When

he arrived, Douglas was very excited to see his brothers and liked to sleep with petitioner or with one of his brothers.

Petitioner testified further that Douglas expressed feeling lost at respondent's home and as though he lived with strangers. He also told petitioner of having several nightmares in which he was chased by snakes or people who were trying to kill him. In one such nightmare, Douglas dreamt that respondent and Yandura had turned into green monsters and killed him. In another, he dreamt that respondent had left him at a grocery store and that there was no one around to help him. After each of these nightmares, petitioner assured Douglas that they were just dreams and that he was in no danger. Petitioner also indicated that Douglas had made several statements about the possibility of his own death. On each of these occasions, petitioner assured Douglas that he was not going to die. Petitioner indicated further that Douglas appeared very depressed when it was time to return to his home in Lake Bluff after spending the weekend in Park Ridge and that Douglas had told him many times that he wanted to live with him and his brothers in Park Ridge. In response, petitioner had told Douglas that he would do everything he could to have Douglas reside with him in Park Ridge.

Petitioner acknowledged that he had not attended any school functions or parent-teacher conferences for Douglas, but explained that he avoided these events because he had previously been threatened by Yandura. He also acknowledged that since September 1986, respondent had provided him with each of Douglas' report cards. He stated further that although he had called Douglas' school and requested notice of parent-teacher conferences, he had received no response.

Respondent testified that after her marriage to Yandura, she and Douglas moved to their home in Lake Bluff, Illinois. During the summer of 1986, all three of her sons lived with her, and respondent was able to observe them together. Yandura's two children from a prior marriage also lived in their Lake Bluff home at that time. Respondent observed that Douglas spent much more time playing with Brad Yandura, her husband's six-year-old son, than he did with his older brothers. Steven Jr. and David spent a lot of time watching television together and frequently teased Douglas, instigating arguments. Respondent indicated that her three sons spent very little time together and fought a lot when they were together.

From September 1986 through June 1987, respondent saw her two older boys approximately once a month and when they had days off school or on holidays. Respondent stated that she had requested more time with Steven Jr. and David, but petitioner refused to allow her to

take them on additional weekends and told her that if she wanted to see them more, she would have to drive to his home in Park Ridge during the week. From January 1, 1987, through the end of the school term, petitioner did not offer respondent any weekend visitation with either of her two older sons. In the summer of 1987, petitioner requested that respondent take custody of all three boys during the week and allow him to take them on the weekends. After some discussion, the parties agreed that the boys would stay with petitioner from Friday evening through Tuesday and with respondent from Wednesday to Friday. During that time period, Douglas spent most of his time playing with his friends in Lake Bluff and spent very little time with his brothers.

Respondent testified further that Douglas had grown very close to Brad Yandura and that they got along very well together. During the week, respondent cared for Douglas before and after school, including preparing his breakfast, lunch, and after-school snack. When Douglas returned from school, she spent time with him before he went out to play with his friends or to attend other activities. While living in Lake Bluff, Douglas became involved in a Cub Scout troop and attended CCD classes. Respondent drove him to and from these activities. During the summer of 1987, Douglas took swimming lessons for four weeks, attended summer school for two weeks, and took tennis lessons for two weeks. During the 1986-87 school year, Douglas received the "Student of the Month" award in his class. Douglas had done very well in school that year and had worked very hard· when compared to his performance at the Park Ridge school.

Respondent testified that she did not learn until February 1987 that petitioner required Douglas to wear diapers because of bed wetting. When she became aware of this situation, respondent immediately spoke to petitioner about it, indicating that Douglas should not be wearing diapers at his age and that he had to take responsibility for his actions. She stated further that Douglas very rarely wet the bed in her home and that it usually only occurred on Sunday nights after Douglas had spent the weekend at petitioner's home in Park Ridge. Other than those rare occasions after he had stayed with petitioner, Douglas did not wet the bed at all in her home. Respondent also stated that Douglas had not had any nightmares about snakes when he slept in her home and did not talk about death to her. He did, however, have two nightmares in August 1987 and one in January 1988.

Respondent indicated that petitioner had not participated in any of Douglas' school activities and did not request to be included in them. Petitioner had never asked her about parent-teacher conferences or re-

quested the names of Douglas' teachers or counselors. Although petitioner never requested copies of Douglas' report cards, she provided them to him. When respondent requested that petitioner send her the report cards of Steven Jr. and David, petitioner responded that he did not even know that the report cards had been issued. Respondent subsequently obtained copies of these report cards directly from the school attended by her sons. Respondent acknowledged that she had not advised petitioner of conferences at Douglas' school or that Douglas had been receiving counseling from Naomi Zimmerman.

Respondent stated that Douglas had established ties with children in Lake Bluff and that she had been providing a very good, loving, and emotionally secure environment for Douglas. In addition, she had provided all of his clothing and school supplies over the previous two years. She believed that her three sons were happy with the current custody arrangement. Finally, respondent acknowledged that she had never sought the court's permission to modify the joint custody agreement, but testified that she would have adhered to the previous schedule if petitioner would have shared in the responsibility for transporting Douglas to and from the parties' homes.

Steven Edsey, Jr., testified that he was 16 years old and was a sophomore in high school. He was employed part time at the YMCA and worked three afternoons each week as well as Saturday mornings. He also played music with a band and practiced his guitar for one hour each night. He practiced with the band on Mondays after school, on Friday nights, and on Saturdays. Steven Jr. did homework for approximately one-half hour each night, then took a shower and went to bed about 10 p.m.

He indicated that he missed Douglas a lot and spent all of Sunday and most of Saturday with him. Douglas had told him more than once that he wanted to live with his father and brothers in Park Ridge. Steven Jr. stated that petitioner appeared unhappy when respondent remarried and had expressed sadness to him about the fact that Douglas did not live with them.

David Edsey testified that he was 14 years old and was a freshman in high school. He indicated that he took care of their new dog, which was acquired for Douglas on March 12, 1988. He stated further that he usually had dinner with Steven Jr. and their father. David then did his homework and watched television with his brother. On weekends, Douglas played with his friend, `Pat, who lived in the house next to theirs. David said that he often played football or computer games with Douglas and Pat. He usually spent Friday night and all of Saturday morning with Douglas.

David also testified that Douglas had said that he wanted to go to Field School in Park Ridge and that he liked it when he was around his brothers. David indicated that he was sad that Douglas did not live with him and missed him a lot. He would rather have Douglas live with him and talked to him almost every night on the telephone. David also stated that petitioner talked to him every couple of days about how sad he was that Douglas did not live with them.

Douglas Edsey testified that he felt fine while staying with respondent in the Lake Bluff home and indicated that everything was perfect there. He played with Brad a lot, watched television, and did things with respondent and Yandura. He indicated that when he stayed at petitioner's home, he played with his new puppy and with his friends, Patrick and Kevin. Douglas stated further that he sometimes played computer games with his brothers. When he was at petitioner's home, he most liked being with his brothers and with petitioner. Douglas stated that the best place for him to live was with petitioner so he could visit with his brothers.

Gary Yandura testified that he shared joint custody of his two children, Brad, age 6, and Amy, age 9, with his former wife. Although his children lived with their mother, he saw them once during the week and on alternating weekends. Yandura indicated that Douglas got along well with both of his children and had a close relationship to Brad. During the summer of 1986, Yandura observed that Douglas sometimes watched television with Steven Jr. and David, but that most of his time was spent playing with Brad and Amy. Yandura stated that he had participated in activities with all of the children, including swimming and a trip to Great America amusement park.

Yandura testified further that he met with Douglas' first-grade teacher for conferences and accompanied respondent to two school assemblies. He also attended two school functions during the 1987-88 school year and went to two parent-teacher conferences. Yandura indicated that he participated with Douglas in the Cub Scout troop and felt good about his ability to communicate with Douglas.

Douglas' first-grade teacher, Delores Januik, and his second-grade teacher, Patricia Quade, both testified that Douglas had done well in their classes, was well liked by the other children, and had developed friendships with his peers. Both teachers indicated that they became acquainted with respondent and Yandura at conferences and other functions. Neither of the teachers had ever met petitioner. Januik stated that the school honored requests by parents for information regarding a student's progress or regarding dates of parent-teacher conferences.

48

Peggy Edsey, petitioner's mother, testified that she was employed as a social worker and intended to commence working on a part-time basis when she reached 62 years of age in July 1988. Mrs. Edsey stated that she and petitioner had discussed the possibility of her caring for Douglas after school if petitioner was awarded custody. Mrs. Edsey acknowledged that she told Dr. Bussell that respondent was a quality mother and testified that she still believed that.

Lynn McGain testified that she lived in the house next to petitioner's. She indicated that her son, Patrick, was very close to Douglas and that they usually play together when Douglas visits petitioner on weekends. McGain stated further that she had agreed to care for Douglas before and after school in the event that petitioner's mother was unavailable.

Naomi Zimmerman testified that she was a psychiatric social worker, family therapist, and child therapist employed by the Family Services of South Lake County in Highland Park and had been involved in this type of social work for 50 years. She first met respondent, Yandura, Douglas, Brad, and Amy on June 30, 1986, when they requested guidance in blending their two families. Zimmerman met with the individual family members and with the family as a unit on 25 occasions during a two-year period.

During September 1986, Douglas went through a period in which he refused to talk to Yandura or to Brad or Amy. This behavior was radically different from that exhibited by Douglas on prior visits. Previously, Zimmerman had observed all three children playing remarkably well together. During an individual interview with Douglas, Zimmerman questioned him about his change in attitude. Douglas responded that he was not supposed to play with strangers and that Yandura and his children were strangers. He explained that both his brothers and petitioner had told him that he should not live with strangers. After this meeting with Zimmerman, Douglas' attitude improved considerably until December 1986, when he said that people were asking him too many questions such as with whom he wanted to live. Zimmerman noted that Douglas appeared very upset on another occasion during the autumn of 1987 because he had wanted to attend a friend's birthday party in Lake Bluff but was unable to do so because petitioner was unwilling to wait two additional hours before picking him up.

Zimmerman related that Douglas had been very happy living with respondent and Yandura when she began her sessions with the family. In August 1986, Douglas told her that he liked living with respondent and Yandura and he was able to see his brothers and petitioner every

weekend. Zimmerman's last visit with Douglas was on December 14, 1987. She saw no further reason to see him because he had been making excellent adjustment to his school and friends.

Although she had never met Steven Jr. and David, Zimmerman knew that Douglas loved his brothers. She also indicated that she thought that petitioner had been a good father based upon Douglas' responses about him. Zimmerman stated that she believed respondent's marriage to Yandura was a sound one and recommended that respondent maintain custody of Douglas. Although this meant separating him from his brothers, Zimmerman testified that in her opinion it was more important for him to remain in the stable home environment established by respondent than to be with his brothers and be cared for by a "substitute mother" when petitioner was unavailable. Finally, Zimmerman stated that she was aware of the large age difference between Douglas and his two older brothers and indicated that in a short time their interests would be very different from his.

Dr. Robert Bussell, who was retained by petitioner, testified that he had been licensed to practice medicine in the State of Illinois since 1958 and had been eligible to practice psychiatry for 25 years. He specialized in the field of adult and child psychiatry. Bussell interviewed petitioner, respondent, their three sons, and Gary Yandura. As a result of these interviews, Bussell found no significant psychopathology in either petitioner or respondent. He also found nothing which would interfere with the ability of either party to be an appropriate parent to Douglas.

Bussell did, however, detect what he considered to be a significant psychopathology in Douglas. He believed that Douglas suffered from reactive depression, which is frequently experienced when one suffers a loss. Bussell found Douglas to be confused about the instant custody battle. He testified that Douglas demonstrated confusion in terms of his loyalty to respondent as opposed to his brothers and petitioner. Douglas exhibited separation anxiety and did not feel secure in his setting. Bussell concluded that Douglas demonstrated a depressed affect.

Bussell perceived Douglas as a sensitive youngster who exhibited exaggerated fear and anxiety relative to separation. He stated that these fears and anxieties were expressed in a relatively active fantasy life replete with themes of loss, separation, and death. Bussell felt that Douglas would need ongoing therapy regardless of which parent had custody, but believed that Douglas' emotional stability would be increased if custody was awarded to petitioner.

Bussell noted that Douglas never expressly verbalized his preference about where he wanted to live. Bussell believed, however, that his

preference was manifested during a game in which Bussell played the role of a judge and showed Douglas one piece of paper which said "Mom" and another which said "Dad." Bussell asked Douglas to give him the piece of paper indicating with whom Douglas wanted to live. Douglas selected the piece of paper which said "Dad." Bussell later told Douglas that he intended to suggest to the court that Douglas live with his father and inquired whether Douglas wanted that suggestion changed. Douglas said he did not and that he wanted the suggestion to get to the judge soon.

Bussell found no evidence that respondent had abandoned Douglas or that he was not perfectly cared for by her. He also found no psychopathology in Yandura which would preclude him from being an appropriate step-parent to Douglas. Bussell noted that Douglas got along well with both of Yandura's children and was especially close to Brad. When Bussell questioned Douglas about his bed wetting, Douglas stated that he thought it was caused by the fact that he drank more water when he stayed with petitioner and that his mother gets more upset when he wets the bed. He also indicated that he preferred that petitioner not put diapers on him and that he would like to try to see if he can go without wetting the bed in petitioner's home.

Bussell concluded that Douglas had a very close relationship with his brothers and was confused as to why he was not living with them. He indicated that Douglas did not want to be disloyal to either parent. Bussell stated that in his opinion, it was in the best interest of Douglas to have custody transferred from respondent to petitioner. Bussell believed that this would afford Douglas a better feeling of stability and that it would be detrimental to Douglas' mental health to keep him separated from his brothers. Although Bussell could not be certain, he did not believe that Douglas' responses had been influenced by petitioner or by his brothers.

Dr. Margaret Wein testified that she was a licensed psychiatrist associated with the Cook County Psychiatric Institute. In accordance with the Institute's established procedures, Mary J. Fleming, a social worker, evaluated Douglas, David, and Steven Jr. as well as Gary Yandura. Wein examined petitioner and respondent.

Upon consideration of Fleming's report and her own observations, Wein concluded that it was in the best interest of Douglas to continue the current arrangement whereby the parties shared physical custody of Douglas. This conclusion was based in part upon the fact that respondent had always been the primary caregiver and a very good parent. In addition, respondent was willing to agree to visitation with petitioner each and every weekend. Wein noted that Douglas expressed

very positive feelings toward respondent and liked the fact that she was there when he came home from school. Wein also found it significant that Douglas' main focus in his interviews was not that he missed petitioner, but was that he missed his brothers.

Wein stated that although it was usually not preferable in a custody case to separate siblings, this case was different because the two older boys chose to stay in their old neighborhood with their friends and father. Wein also found it significant that there was a great age difference between Douglas and his brothers and, consequently, the two older boys were in an entirely different social group with different interests and activities.

Wein indicated that she focused on which party was the better parent to have custody rather than on how many hours Douglas would spend with his brothers. She stated further that she believed Douglas would be unhappy regardless of which party had physical custody because he would not be able to live with both of his parents together. Wein noted that during one interview Douglas indicated that he wanted to live with respondent, but in another interview he stated that he wanted to live with petitioner. Wein was not surprised that Douglas' statements were contradictory because he wanted to be with both of his parents. Wein also explained that Douglas appeared to have experienced a lot of pressure from his brothers and petitioner to side with them against respondent.

Dr. Karen Smith testified that she was an attorney and a clinical psychologist employed by the circuit court of Cook County. Smith interviewed and evaluated both petitioner and respondent. Based upon her evaluation of the parties, Smith indicated that petitioner exhibited mood instability and believed that it would not be in Douglas' best interest to be in petitioner's custody. Smith indicated further that respondent exhibited a conventional outlook within the bounds of reality and was in touch with her emotions. Smith also noted that respondent appeared to be a caring and involved parent with no gross psychopathology that would interfere with her ability to care for Douglas. Smith concluded that there was no need to alter the current living conditions of Douglas.

Upon consideration of all of the evidence presented, the trial court found by clear and convincing evidence that there had been a fundamental change in the geographic location of the parties which required a modification in custody of Douglas. The trial judge then indicated that she had considered all of the required statutory factors and concluded that it was in Douglas' best interest to grant custody to petitioner. The judge stated that a child's preference as to his custody was

important and indicated further that she was satisfied that Douglas' preference was to live with his brothers who lived with his father. The trial judge specifically stated, however, that she had not based her decision to modify custody upon Douglas' separation from his brothers.

Respondent subsequently filed a petition for attorney fees, and at the hearing on her petition, she testified that she had incurred legal expenses totalling $24,810, of which she had already paid $20,412. She stated that she had taken out a home equity loan in order to pay her counsel $15,000 of that amount in June 1988. She had also borrowed $5,300 from her parents to pay counsel and she had repaid her parents about 50% of that amount. She had also paid her appellate counsel the sum of $7,000 plus an additional $2,300 for the payment of trial transcripts.

Respondent testified further that she had an equity line of credit against her home in the amount of $23,000 of which she had used $15,000 to pay counsel in June 1988. Her various savings and checking accounts reflected balances totaling $4,088. Respondent also indicated that she was working as a crossing guard five days each week during the school term, earning a net salary of $159 each two weeks. She stated that she had no other source of income and that she was a housewife. She also indicated that she had been employed throughout her marriage to petitioner and had last worked on a full-time basis in 1969.

The parties stipulated that respondent's counsel was an expert in the field of matrimonial law and that his hourly fees were reasonable for divorce specialists in the Chicago community given his level of competence. The parties further stipulated that the summary of hours expended in these proceedings by respondent's counsel correctly set forth all of the time expended by him in representing respondent.

Petitioner testified that he owned a corporation of which he was president. The evidence disclosed that petitioner earned gross wages of $60,000 in 1986, $70,000 in 1987, and $78,000 in 1988. His corporation paid for his health insurance and for the health insurance for his three sons. His corporation purchased a 1987 Chevrolet Suburban vehicle in 1987 which was used by petitioner for his personal needs. Petitioner testified further that he owned a home in Park Ridge, a farm in Wisconsin, and had various other investments having values totaling $180,000. He stated that he had paid legal fees for representation in these proceedings in the amount of $19,500.

At the close of respondent's case on her petition for fees, the trial judge indicated that respondent had an additional equity line of credit of $8,000 and found that she could not determine what respondent's

income would be. In a verbal ruling, the court denied respondent's petition for fees. Thereafter, the court on its own motion entered a written order which augmented her verbal ruling. The written order reflected that respondent had not shown her inability to pay her attorney fees in that there had been no showing as to why she was not capable of gaining full-time employment.

Approximately six months after the trial court awarded physical custody of Douglas to petitioner, respondent filed a petition for modification of the court's custody order in which she asserted that there had been changes in circumstances which adversely affected the physical, mental, and emotional health of Douglas. Respondent's petition requested that physical custody of Douglas be returned to her. The record indicates that this matter was referred to the mediation program of the domestic relations division of the circuit court of Cook County, but does not disclose the ultimate disposition of respondent's petition for modification.

Initially, we note that the trial court's ruling on the custody of Douglas was entered on May 6, 1988. The record reveals that the order of May 6, 1988, denied petitioner's request for sole custody of Douglas, reaffirmed the prior order of joint custody, but altered the place of residence of Douglas. This order also stated that the issue of visitation with Douglas was reserved for the parties' agreement or for further determination by the court, specifically provided for the filing of petitions for attorney fees by both parties, and reserved judgment on those issues. The order entered on May 6, 1988, did not contain a finding that it was final and appealable under Supreme Court Rule 304(a) (107 Ill. 2d R. 304(a)). On November 17, 1988, the trial judge entered a verbal ruling denying respondent's petition for attorney fees. On November 30, 1988, the trial court on its own motion entered a written order which augmented the prior verbal ruling on respondent's petition for attorney fees. The written order indicated only that respondent had not shown her inability to pay her attorney fees in that there had been no showing as to why she was not capable of gaining full-time employment. This order did not reflect that it was final and appealable under Supreme Court Rule 304(a) (107 Ill. 2d R. 304(a)). On December 20, 1988, the court entered an order disposing of all pending issues, including visitation with Douglas, child support, and attorney fees. This order stated that it was final and appealable. The notice of appeal was timely filed on January 5, 1989.

We next address respondent's contention that the trial court erred in awarding petitioner custody of Douglas.

Section 610(b) of the Illinois Marriage and Dissolution of

Marriage Act (Act) provides that a court shall not modify a custody judgment unless it finds by clear and convincing evidence, upon facts that have arisen since, or were unknown at the time of, the prior custody order, that a change has occurred in the circumstances of the child or his custodian and that modification is necessary to serve the best interest of the child. (Ill. Rev. Stat. 1987, ch. 40, par. 610(b).) This provision reflects an underlying policy favoring the finality of child custody judgments and creates a legislative presumption in favor of the present custodian, thereby promoting the stability and continuity of the child's custodial and environmental relationship which is not to be overturned lightly. *In re Custody of Sussenbach* (1985), 108 Ill. 2d 489, 499, 485 N.E.2d 367, 371; *In re Marriage of Wechselberger* (1983), 115 Ill. App. 3d 779, 786, 450 N.E.2d 1385, 1389.

■ In child custody proceedings, the best interest of the child is of paramount concern (*In re Marriage of Hazard* (1988), 167 Ill. App. 3d 61, 69, 520 N.E.2d 1121, 1126), and section 602 of the Act sets forth certain factors which must be considered by the court in determining the best interest of the child, which include the wishes of the child's parents, the wishes of the child, the interaction and interrelationship of the child with his parent or parents, his sibling and any significant others, and the child's adjustment to his home, school and community (Ill. Rev. Stat. 1987, ch. 40, par. 602(a); *Shoff v. Shoff* (1989), 179 Ill. App. 3d 178, 184, 534 N.E.2d 462, 466).

In the instant case, the trial court found by clear and convincing evidence that respondent's move to Lake Bluff altered the geographic location of the parties and constituted a fundamental change in circumstances which required a modification in custody of Douglas. With respect to the best interest of the child, the court found Dr. Bussell's testimony persuasive and indicated that Douglas' preference was important, finding that Douglas preferred to live with his brothers who lived with his father. The trial judge stated that she was clearly convinced that it was in Douglas' best interest to award custody to petitioner. Although the judge indicated that she had considered all of the required statutory factors, the record does not reflect that these factors were analyzed within the evidence before the court. Rather, it appears that the court's decision was predicated primarily upon the testimony of Dr. Bussell and upon Douglas' *in camera* statement that the best place for him to live was with his brothers who lived with his father.

The court's primary reliance on these factors attributed to them undue importance where the evidence revealed that Douglas had in other interviews expressed a preference for residing with the respond-

ent and that his main focus was not that he missed the petitioner, but that he missed his brothers. We find it significant that Bussell testified that Douglas never verbally expressed a preference for living with the petitioner and that this testimony corroborated other evidence indicating that Douglas wanted to live with both of his parents together and was very confused about where his loyalties should lie. There was also evidence that Douglas had been pressured by his brothers and by petitioner to side with them against respondent, and Bussell acknowledged that he could not be certain that Douglas' responses had not been influenced by his brothers or by petitioner.

This evidence indicates that Douglas' *in camera* statement and his responses during his interview with Bussell were less than reliable indicators of his desires as to which party should have custody. Moreover, it has been held that a court need not ascribe controlling weight to a child's preference where the child is not mature or where there is no indication that the preference was based on sound reasoning. (*Shoff,* 179 Ill. App. 3d at 185, 534 N.E.2d at 467.) A court may find that the child's preference is not in the child's best interest (*In re Marriage of Leff* (1986), 148 Ill. App. 3d 792, 810, 499 N.E.2d 1042, 1054), especially where the child's reasons are not related to his best welfare (*Shoff,* 179 Ill. App. 3d at 185, 534 N.E.2d at 467; *In re Marriage of Jones* (1987), 160 Ill. App. 3d 593, 597, 513 N.E.2d 1181, 1184). In addition, it has been held that it may sometimes be in the best interest of the child to separate him from siblings. *Hazard,* 167 Ill. App. 3d at 70, 520 N.E.2d at 1127; *In re Marriage of Slavenas* (1985), 139 Ill. App. 3d 581, 587, 487 N.E.2d 739, 742.

In the instant case, it is clear that eight-year-old Douglas cannot be considered mature and that his responses were not related to his best welfare, but were motivated solely by his desire to be with his brothers.

In making her ruling, the trial judge specifically noted the length of Dr. Bussell's report and stated that she found that report persuasive. We do not believe that the length of a psychiatrist's report, the number of issues addressed, or the number of persons interviewed are necessarily controlling factors in consideration of a custody case, and we note that the witnesses for respondent also addressed all of the relevant issues.

In addition, some of the evidence which could have impacted upon the court's analysis of the statutory factors was apparently overlooked or greatly discounted. Specifically, the evidence established that Douglas experienced nightmares and a problem with bed wetting when he stayed with petitioner. Even though he had occasionally experi-

enced these problems in respondent's home, it was rare, and they occurred with much greater frequency at petitioner's home. Although petitioner had reassured Douglas that he need not fear nightmares or death, his response to the bed-wetting issue was to put diapers on his son, which Douglas told Bussell he disliked. There was no evidence that petitioner had ever attempted or even considered obtaining some form of counseling or guidance to help Douglas overcome these obstacles.

Moreover, the evidence indicated that Douglas had, in fact, become integrated into his home, family, school, and community in Lake Bluff. He had grown very close to Brad Yandura, had developed ties and friendships with peers, and was involved in Cub Scouts and CCD classes. This conclusion is supported by the testimony of respondent, Yandura, Zimmerman and Douglas' teachers. Yet, in entering her decision, the trial judge made no reference to the testimony of Zimmerman and that of Douglas' teachers. Thus, the record does not reflect what weight, if any, the court ascribed to this evidence.

Additionally, we note that Douglas is seven years younger than David and nine years younger than Steven Jr. The record indicates that the two older boys are both in high school and are involved with extracurricular activities and part-time employment after school. Because the trial judge made no comment in her ruling as to the disparity in the ages of the three brothers and what interests they might share, even if living in the same household, we believe the court failed to consider this important factor in reaching her decision.

■■■ ■ In custody cases, the question for the reviewing court is whether the trial court's decision was contrary to the manifest weight of the evidence. (*Sussenbach*, 108 Ill. 2d at 499, 485 N.E.2d at 371.) A court of review may consider the entire record before it. (*Foxcroft Townhome Owners Association v. Hoffman Rosner Corp.* (1983), 96 Ill. 2d 150, 155, 449 N.E.2d 125, 127; *La Salle National Bank v. Edward M. Cohon & Associates, Ltd.* (1988), 177 Ill. App. 3d 464, 474, 532 N.E.2d 314, 321.) Regardless of the view expressed in the dissent, we find that no fair-minded trier of fact would conclude that the evidence in this case was overwhelming in favor of the petitioner. Rather, we find that consideration of the entire record indicates that the trial court's determination was contrary to the manifest weight of the evidence.

We next consider whether the trial court erred in ruling in petitioner's favor at the close of respondent's case on her petition for attorney fees.

■■■ ■ Section 508(a)(3) of the Act provides that the trial court

may order either party to pay a reasonable amount for attorney fees necessarily incurred by the other party in any proceeding under the Act. (Ill. Rev. Stat. 1987, ch. 40, par. 508(a)(3).) An award of attorney fees is justified where the spouse seeking relief demonstrates (1) financial inability to pay, and (2) the ability of the other spouse to pay. (*Hazard*, 167 Ill. App. 3d at 71, 520 N.E.2d at 1128.) Proof of financial inability does not require a showing of destitution and will be demonstrated where payment would strip the person of the means of support and undermine her economic stability. (*Hazard*, 167 Ill. App. 3d at 71, 520 N.E.2d at 1128.) The award or denial of attorney fees is within the sound discretion of the trial court, and that decision will not be disturbed absent a clear abuse of discretion. *Hazard*, 167 Ill. App. 3d at 71, 520 N.E.2d at 1128.

In the instant case, the evidence established that there was a great disparity between the earning abilities of the parties. We believe that the trial judge erred in denying respondent's petition for fees. Due to this disparity in earning abilities, we find that the trial court's ruling on respondent's petition for fees was an abuse of discretion and that further proceedings on respondent's petition for attorney fees are required to determine what fees are reasonable.

In addition, we believe that the trial court relied upon inappropriate reasons to justify her ruling on the petition. In ruling in petitioner's favor at the close of respondent's case, the trial judge found that she was unable to determine what respondent's income would be. The written order that was subsequently entered reflected that respondent had not shown her inability to pay fees in that there had been no showing as to why she was not capable of gaining full time employment. Neither of these reasons provides a sufficient basis to deny attorney fees under section 508(a)(3) of the Act. Ill. Rev. Stat. 1987, ch. 40, par. 508(a)(3).

For the foregoing reasons, the judgments of the circuit court of Cook County are reversed, and the cause is remanded for further proceedings consistent with this opinion.

Reversed and remanded.

EGAN, J., concurs.

JUSTICE McNAMARA, dissenting:

I respectfully dissent from the majority holding which reverses the trial court order granting custody of Douglas to his father, the petitioner. I would find that the evidence overwhelmingly supports the

trial court decision, and thus we are prohibited from disturbing that order.

A custody determination lies within the sound discretion of the trial court, since it alone is in the best position to judge the witnesses' credibility and determine the needs of the child. (*In re Custody of Sussenbach* (1985), 108 Ill. 2d 489, 485 N.E.2d 367.) The reviewing court is prohibited from trying the case *de novo*, as the majority appears to be doing here. It must limit its role to determining whether the trial court's transfer of custody constituted an abuse of discretion or is contrary to the manifest weight of the evidence. *In re Custody of Sussenbach* (1985), 108 Ill. 2d 489, 485 N.E.2d 367.

The majority asserts that the trial court's decision demonstrates a "primary reliance" on Douglas' preference, as expressed to Dr. Bussell and to the court in chambers. The trial court, however, rested its decision on a much broader foundation than just Douglas' preference. It considered all of the statutory factors under section 602 of the Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1987, ch. 40, par. 602).

After the trial, the court specifically cited examples of testimony, explaining that it wanted to reassure the parties that it had heard all of the evidence. The evidence considered included testimony from teachers, neighbors, family friends and various experts. The evidence also included report cards, family photographs, psychological test results, expert reports and Douglas' drawings. The evidence addressed issues of school performance, after-school activities, hours of watching television, movies attended, religion classes, Cub Scouts, outside interests, sports and recreational activities, enjoyment of computer games, musical interests, friendships, vacations, parent-teacher conferences, Christmas celebrations, and doctor visits.

In the face of the trial court's diligent and close attention to such detailed, exhaustive evidence, it is erroneous to conclude that the court's decision was predicated primarily on Douglas' preference.

Moreover, the majority fails to recognize that the court's heavy reliance on Dr. Bussell's recommendation went far beyond Dr. Bussell's single statement that Douglas preferred to live with his father. The court expressly stated it was impressed by the depth of Dr. Bussell's interviews and the persuasiveness of his overall testimony.

Dr. Bussell submitted an 11-page, single-spaced report to the

court. He conducted 16 interviews of the parties, Yandura, the three Edsey children, and the paternal grandmother. He addressed a vast array of issues related to Douglas' welfare, and went far beyond the mere preference indicated by Douglas. The trial court properly relied on the fact that Dr. Bussell based his recommendation on many factors, and that Dr. Bussell did not look at each family member or individual factor in a vacuum.

For example, Dr. Bussell, a child psychiatrist for 25 years, concentrated on Douglas' emotional problems within the context of the family's interactions, and in a much more extensive and in-depth manner than did the Psychiatric Institute's social worker in her single interview with Douglas. Dr. Bussell found psychopathology in Douglas:

> "He is confused by the custody battle. He is demonstrating confusion in terms of his loyalty to his mother versus his father and his brothers. He has some definite separation anxiety and he does not really at this time feel secure in his setting."

Douglas needed more stability. Dr. Bussell described Douglas as needing "ongoing therapy irrespective as to which parent has custody. I do feel, however, that at this time his emotional stability will be increased if custody is awarded to father." He quoted the results of psychological testing done on Douglas: "He comes across as a sensitive, perceptive youngster but one who exhibits exaggerated fears and anxieties relative to separation. These fears and anxieties are expressed in a relatively active fantasy life, one replete with themes of loss and separation, and death." Douglas appeared depressed in all four of the sessions with Dr. Bussell. The psychological testing "essentially confirmed" Dr. Bussell's impression of depression.

Dr. Bussell was asked for an opinion as to the impact on Douglas if he were forced to live separate from his brothers.

> "I think it would be detrimental to his mental health. Possibly even more so now that the litigation has been effected because before he may have been less than happy with his setting, but now he is optimistic that it will be changed. He is confident that the court will do the right thing. So it would be a significant disappointment. I'm not saying he would not get over it at some time, but it would certainly be a significant psychological blow to him at this time."

Dr. Bussell, testifying in rebuttal for petitioner, reaffirmed his opinion that Douglas suffered from depression directly as a reaction

to the situation of his immediate environment. He disagreed with any opinion to the contrary offered by the Psychiatric Institute. Moreover, if Douglas stayed with his mother, the depression would probably get worse. In addition to the heightened depression, he would expect to see an element of bitterness added to the child's personality.

The court could also rely on the fact that Dr. Bussell met with the family members many more times than any other expert. Psychiatric Institute team members never saw a family member more than once. Dr. Bussell saw the father five times, the mother three times, Douglas four times, David, Steve and Yandura each once, and the paternal grandmother once. The trial court was also entitled to rely on the fact that Dr. Bussell carefully examined the relationship of the siblings to each other, and the relationship of the siblings to their parents. The Psychiatric Institute virtually ignored this factor.

Dr. Bussell noted, for example, that petitioner, one of eight children, had a "very, very close" family which "still maintains significant interaction." He went on to reason that "[t]his may have somewhat rubbed off on Douglas and may well explain his extremely close relationship and feelings for his two older brothers." Dr. Bussell found that in "some ways it seems that Douglas feels more stability in his relationship with his brothers than with either parent."

While there was some negative reference made by the Psychiatric Institute to the age difference between Douglas and his brothers, Dr. Bussell noted that "[c]uriously enough, the [age] spread between Lynne and her next older brother is almost identical to the spread between Doug and David." Respondent testified that she was close to her brothers.

In fact, Dr. Bussell suggested that the age difference permitted an even closer bonding and provided important stability for Douglas which his parents individually had not been able to provide. He explained that Douglas has a "very close filial relationship with his brothers. He has seen his parents separate, and not infrequently, and there is a significant age difference here between him and his next older brother, and not infrequently a child will establish a stronger bond with his siblings." Douglas had "very definitely" done that. The siblings' bond was "more than average. It is a combination of what I think is going on in his life, what has gone on in the recent past, and also he has observed his father's family which is very, very close."

Again avoiding isolating any single factor, Dr. Bussell took an expanded view of the impaired relationship between respondent and the two older boys, and the effect that would continue to have on Douglas were he to live with his mother. He explained, "This relationship has to be considered in the recommendation due to the fact that one must consider [the two older boys'] potential influence on Doug in view of the fact that both feel somewhat rejected and hurt by [their] mother, to their perception, only really wanting Doug with her." Dr. Bussell testified, "The fact that he was not with his brothers and that he did not feel that she wanted them with her, that would affect the relationship."

Thus, Dr. Bussell offered his opinion, based on the extensive interviews, psychological testing, and all documentary materials reviewed, including reports from Zimmerman and the Psychiatric Institute, that within a reasonable degree of psychiatric certainty, it would be psychiatrically in Douglas' best interest to live with his father.

> "In my opinion after the evaluation I feel his best interest would be served by a transfer of physical custody from mother to father. With very extensive and liberal visitation for mother. *** I think it would afford him a better feeling of stability in a setting, he has a great deal of affection for both of his parents, and they are both essentially healthy people, and that is why this case is so very, very difficult. I feel that his stability will be heightened living with his brothers and his father. I think he will overcome a significant amount of depression."

For the majority to conclude that the trial court was not entitled to place considerable reliance on this expert's recommendation simply ignores the depth, the thoroughness, and the solid foundation upon which the recommendation rests. It is for the trier of fact, not this court, to resolve conflicts between expert opinions in custody cases. The majority has no basis for characterizing the trial court's reliance on Dr. Bussell as granting "undue importance" to that opinion.

The majority is wrong, therefore, in suggesting that the trial court "ascribed controlling weight" to Douglas' preference. However, while the record reveals no indication that the preference received such weight, the court certainly was entitled to consider the numerous, credible ways in which Douglas expressed that preference. The likelihood of Douglas' preference being accurately given was revealed by Dr. Bussell's extensive use of various objective

means to explore the issue. He did not merely ask Douglas whose home he preferred.

Dr. Bussell first offered four possible alternate solutions, and asked Douglas to grade them by his preference. Douglas chose this order: (1) He would live in Park Ridge with his father and brothers; (2) his mother would move back to Park Ridge and split time with his father; (3) his father would move to Lake Bluff and split the time; and (4) his brothers would move in with his mother.

Next, Dr. Bussell asked Douglas to draw a picture of his "family," which tends to demonstrate the child's perception of "his relationship within the family." Douglas drew Steve first mowing the lawn, his father second golfing, Dave third riding his bike, and himself fourth watching television at his father's home. At trial, Dr. Bussell noted that not including the mother or her new husband was significant, "and what made it even slightly more significant in this particular instance is that the day that he did the drawing at my request was the day that [his] mother brought him in to the interview so she was sitting and waiting."

Douglas also told Dr. Bussell he would prefer to attend the Park Ridge school, which is near his father's home.

In addition, Douglas told Dr. Bussell to "tell the court that I want to live with my dad."

Furthermore Dr. Bussell offered Douglas two slips of paper, one which said "mom" and the other which said "dad." He asked Douglas to pass Dr. Bussell the note which stated which parent he wanted to live with, and Douglas passed him "dad." Dr. Bussell responded, "Oh! I see mom!" Douglas immediately corrected him, pointing out that it said "dad." Dr. Bussell then asked if his left hand felt differently than his right hand, but Douglas again passed the note which read "dad."

At trial, Dr. Bussell testified that he saw Douglas a fourth time, after he had submitted his written report.

> "[H]e was not aware as far as I could discern that I had submitted a report, and I had told him on that occasion that I had suggested that he live with his dad but it was not too late and I could send in an addendum to the report if there was anything he would like me to do. He said he did not want me to change the report and just wanted me to get to the judge soon."

Dr. Bussell also noted that Douglas often left his school clothes at his father's home, which, together with the family drawing, and the paper slip game, "would appear to indicate that his unconscious

preference is to be with his father and brothers."

For the majority to brush aside this strong, corroborated evidence by saying "Douglas never verbally expressed a preference for living" with his father is another improper and persistent attempt to supplant the role of the trier of fact. 199 Ill. App. 3d at 55.

In addition, the majority asserts that Douglas' preference was the result of pressure from his brothers and father. I note that Dr. Bussell "checked" the preference with many different methods, exploring any unconscious desires or coaching. The majority offers weak reasoning when it states that Dr. Bussell "acknowledged that he could not be certain that Douglas' responses had not been influenced by his brothers or by petitioner." (199 Ill. App. 3d at 55.) Obviously, no one—even the parents—can guarantee the absence of any undue influence or coaching. However, Dr. Bussell testified, "To a reasonable degree of medical certainty, I would say he [the father] did not" influence Douglas regarding his preference.

Moreover, the court could rely on its own *in camera* interviews with the three boys, in which they corroborated each other in expressing Douglas' wishes, and the older boys' wishes, that he live with their father.

The majority focuses on the assertion that Douglas' preference to live with his father was "not related to his best welfare, but [was] motivated solely by his desire to be with his brothers." (199 Ill. App. 3d at 55.) It also states that Douglas' "main focus was not that he missed the petitioner, but that he missed his brothers." (199 Ill. App. 3d at 55.) I am unaware of any principle which prohibits, particularly in view of the equality of the parties' parenting capabilities, the consideration of the child's needs within the context of a significant, strongly bonded sibling group.

I believe that the majority becomes a trier of fact when it asserts that "some of the evidence which *could have* impacted upon the court's analysis of the statutory factors was *apparently overlooked or greatly discounted.*" (Emphasis added.) (199 Ill. App. 3d at 55.) In so doing the majority supplies its own expert opinion and explanation for the child's behavior.

It first lists the nightmare problem which occurred "with much greater frequency at petitioner's home." (199 Ill. App. 3d at 56.) Each parent cited a few nightmares. No expert paid considerable attention to them, and they are not an area of expertise for our court. Then the majority refers to the bedwetting problem. It implies that the bedwetting indicates that Douglas experienced more stress in his father's home. This is also outside our field of exper-

tise. It is for the trier of fact to consider the witnesses' testimony regarding bedwetting.

The majority also lists the fact that Douglas had become "integrated" into his mother's home, had friends, and went to CCD classes and cub scouts. There was equal evidence of Douglas' integration into his life in Park Ridge, where he had lived since he was born. The trial court was not required to find the Lake Bluff integration any more significant than in Park Ridge.

The remaining evidence which "could have impacted upon the court's analysis," which the majority believes was "apparently overlooked or discounted," is such that the court was entitled to disregard it. 199 Ill. App. 3d at 55.

For example, the Psychiatric Institute team recommended that Douglas live with his mother. The trial court was justified in its express finding, however, that the Psychiatric Institute report suffered, in comparison to Dr. Bussell's report, in "two significant ways." First, the Institute focused almost exclusively on the "pathology of the parents *** versus the best interest of the child, which is what I am required to determine." Second, Dr. Wein's "failure to talk to Doug herself in light of the interview that she was presented with by her associates made it very difficult for me to adopt her conclusions."

Karen Smith, a psychologist who worked on the Psychiatric Institute team, recommended that Douglas live with his mother. However, she never saw Douglas. She spent about an hour with each parent and decided the father had "personality problems." She admitted, however, that she did not have the "time or space" to write down many of the father's statements, and that an in-depth evaluation requires more time and tests. In addition, she based her perceptions about the father on the mother's descriptions of the father. Incredibly, she explained, "I had no reason to doubt her."

Notably, on rebuttal Dr. Bussell disagreed with Smith. He offered a strong opinion that based on his five interviews, his experience, and the psychological evaluation performed by a psychologist he had worked with for 20 years, he did not believe the father had a narcissistic personality or other personality problems.

Dr. Margaret Wein, a psychiatrist and member of the Psychiatric Institute team, testified as an expert for respondent and recommended that Douglas live with his mother. Dr. Wein spent 45 to 60 minutes interviewing the mother and the father, and admitted that the time was inadequate to get full and complete personality profile information. When Douglas was asked his living preference, Wein

believed his answer to be ambivalent. The only information Dr. Wein could offer to help the court was that Douglas was in conflict, wanting both parents, but he especially missed his brothers. She also offered the less than helpful opinion that Douglas would be unhappy in either situation. Generally, Dr. Wein would leave siblings together. Here, she would ignore the general rule simply because the two older boys preferred to be with their father.

In view of these weaknesses in the other "discounted" evidence, the trier of fact could reasonably choose not to rely on the expert opinion of the Psychiatric Institute, and instead choose to rely on the expert opinion of Dr. Bussell.

Nor was the trial court required to rely on the testimony of Naomi Zimmerman, a social worker who also testified for respondent that Douglas should live with respondent. Zimmerman had seen some of the family in 25 counseling sessions over a two-year period. Most significantly, however, she never saw petitioner, or the two older brothers. Zimmerman found this fact unimportant. Quite simply, Zimmerman believed a child's place is with the mother. Interestingly, Zimmerman stated that "a mother of a child of five should be utilized if she's available and well and sound of mind, for a five year old. I might make a different opinion if he were 10 or 12." In fact, Douglas is now 10 years old.

I must also comment on the idea which was expressed several times, that the mother was somehow better suited for custody because Douglas could thereby avoid having a babysitter (his grandmother or next door neighbor) for a few hours after school. A trier of fact could reasonably conclude that this opinion carries little weight for several reasons. Most notably, the judgment for dissolution of marriage stated: "The parties acknowledge that it is likely that both may be employed and therefore each party agrees to obtain proper care for the minor children while the minor children are in their physical custody and they are at work." Moreover, the December 20, 1988, order instructs the mother to find full-time employment and assist in supporting the three children.

The trial court might also have considered other indications that Douglas' best interest would not be served were he to live with his mother. For example, the mother admitted that she agreed to let all three boys live with the father, as evidenced by a letter she wrote on April 23, 1986, and subsequently surprised everyone by abruptly changing her mind. In addition, the mother unilaterally changed the joint custody agreement, an action which is never favored by the courts. Moreover, by all accounts, her relationship with the two

older boys was quite conflictual.

For these reasons, I would affirm the trial court order finding that it would be in Douglas' best interests to change physical custody from a 50-50 split between the parents to the father, because that decision is not against the manifest weight of the evidence.

I agree with the majority's finding that the trial court erred in denying respondent's petition for fees.