108 Ill.2d 489 (1985)
485 N.E.2d 367
In re CUSTODY OF TERESA SUSSENBACH (Carol Lynn Boyd, Appellee,
v.
Max Harry Sussenbach, Appellant).
No. 61182.
Supreme Court of Illinois.
Opinion filed October 18, 1985.
*490 *491 W.A. Dillow III, P.C., of Greenville, for appellant.
James E. Buchmiller Ltd., of Greenville, for appellee.
Appellate court reversed; circuit court affirmed.
JUSTICE RYAN delivered the opinion of the court:
Defendant, Max Sussenbach, appeals from a Rule 23 *492 order (87 Ill.2d R. 23) of the appellate court reversing an order entered by the circuit court of Bond County which had transferred custody of his daughter, Teresa Sussenbach, then age 9, from plaintiff, Carol Boyd, the child's mother, to defendant (129 Ill. App.3d 1165). We allowed defendant's petition for leave to appeal (94 Ill.2d R. 315(a)), and now reverse. Two issues are raised in this appeal: (1) whether the trial court erred in transferring custody to Max; and (2) whether the trial court erred in failing to make any provision for the payment of child-support arrearage owed by Max.
On July 13, 1978, the parties' marriage was dissolved. Max did not appear at the proceedings, and consequently judgment was entered by default. Pursuant to a written separation agreement, which was incorporated in the judgment of dissolution, Carol was awarded custody of Teresa, the couple's only child. The agreement further provided that Max was to pay $30 per week in child support.
Teresa lived with her mother, Carol, from the time of the divorce until December of 1981, when Carol, under the circumstances noted below, voluntarily transferred custody to Max and agreed that he would not have to pay support for the period that Teresa was in his care. On November 5, 1982, Carol filed a petition seeking an increase in the amount of support payments. At the same time, she also filed a petition for a rule to show cause for Max's failure to return Teresa and for his failure to pay support. Max then filed a petition to modify the judgment of dissolution, requesting the court to grant him permanent custody and to order Carol to pay child support. Separate hearings were held on the petitions. For purposes of our decision, it is not necessary to set forth all the evidence which was presented at the hearings; we will recite only those facts relevant to the issues before us.
*493 With respect to Max's petition for a change in custody, the evidence can be summarized as follows. Shortly after the parties' divorce, Max married his present wife, Jo Ellen. They have two children, a daughter, Jamey, age 7, and a son, Kyle, age 3. Jamey is Jo Ellen's child by a previous marriage. During the period that Carol had custody of Teresa, Carol had two live-in boyfriends. She admitted to having sexual relations with both men. The first live-in arrangement lasted two weeks. Thereafter, in August of 1981, Ed Boyd moved into Carol's home. Ed and Carol were married in June 1982, approximately six months after Carol gave custody of Teresa to Max. Except for brief periods of employment, Ed has been unemployed since his discharge from the service in February of 1981. Carol, on the other hand, works as a checker at a grocery store which, until recently, was managed by her father. She testified that she works from either 8 a.m. to 5 p.m. or 11 a.m. to 8 p.m., Monday through Friday. She also stated that she works every Saturday and occasionally on Sunday. Because of Carol's work schedule and Ed's unemployment, Ed babysat for Teresa almost every day from the time he began living with Carol until the time Teresa went to live with Max.
The evidence also established that on at least one occasion, Carol and Ed took Teresa to a tavern where they remained until 1 or 2 a.m. Carol also admitted that she previously took Teresa to the same tavern and became intoxicated. They did not leave the establishment, she said, until 1 a.m.
Carol further testified that after Ed returned from a party intoxicated she talked to him about his drinking and about what was described as his "possible carousing around with [another] woman." She also said that while Teresa was visiting her on the weekend prior to the custody hearing, Ed went out drinking and was involved in *494 an automobile accident when he "missed a curve" at 1 a.m. while returning home.
The record further reveals that during the period that Carol had physical custody, she did not attend any parent-teacher conferences or school functions. Indeed, the only contact she had with any of Teresa's teachers was for the purpose of obtaining her daughter's school records for the custody hearing.
Gloria Wasmuth, Carol's mother, testified that Teresa developed a serious emotional problem while living with Carol. Teresa, she said, would often "sit and stare in space and cry very easily." Mrs. Wasmuth stated she worked with Max and Jo Ellen toward resolving the problem. In Mrs. Wasmuth's opinion, it would be in Teresa's best interest if she lived with Max.
Mike Wasmuth, Carol's brother, testified that Ed once boasted about owning an apartment complex in Houston, going so far as to invite Mike and his wife to travel to Houston to visit the complex with him and Carol. After Mike had made the airline reservations, Carol informed him that Ed had fabricated the entire story about owning an apartment complex. Mike also recounted an incident which occurred prior to Ed and Carol's marriage while Carol still had custody of Teresa. Mike stated that he and his wife had occasion to spend the night at Carol's home. They stayed in Carol's bedroom; Teresa was in her room; and Ed and Carol were in the living room. After everyone had retired, Mike heard sounds coming from the living room sufficiently loud enough to keep him and his wife awake. Mike testified he "had a pretty good idea" of what was going on: "I figured they were having sex." Teresa, he said, was in close proximity to the living room so that she also could have heard the same noise.
As we stated earlier, Carol voluntarily transferred custody to Max in December 1981. The incident which *495 precipitated the transfer occurred in early December when Ed spanked Teresa with a a wooden paddle, leaving two severe bruises on her buttocks. Max discovered the bruises two days later while Teresa was on a weekend visit and immediately took Teresa to the hospital. According to the doctor who examined Teresa, the bruises measured four centimeters by five centimeters and were surrounded by an additional area of red and roughened skin. The doctor also stated that an excessive amount of force was required to cause the bruises. Ed testified that he had spanked Teresa with a wooden paddle the previous October but claimed he only used his hand when he spanked her in December. The evidence, however, clearly showed that Ed had, in fact, used a wooden paddle in the December incident.
Following his discovery of the bruises, Max informed Carol that he would not allow Teresa to return to her home. In addition, he contacted Michael Sheely, an investigator for the Bond County State's Attorney, to determine whether Teresa had been the victim of child abuse. While Sheely found "reason for concern," he was unwilling to go so far as to say that child abuse had taken place. Sheely later met with Max and Carol to discuss the custody situation. At the meeting, as noted above, it was agreed that Carol would give custody to Max on a temporary basis and that Max would not have to pay child support for the period that Teresa was in his care.
Carol admitted that after Teresa went to live with Max, she did not have any contact with her daughter for 45 days. She also admitted that for a five-month period in 1982 she did not contact either Max or Jo Ellen about exercising visitation with Teresa. Moreover, even though Teresa made regular weekend visits to the home of Carol's parents, Carol never talked to her parents about seeing Teresa. While the record shows that a rather hostile relationship existed between Carol and her mother, *496 Carol conceded that she never asked her father, whom she saw every day at the grocery store, if she could visit her daughter.
With regard to the period from December 1981, when Max gained custody, until the time of the court hearings in early 1983, the record shows that Teresa was happy, well adjusted, and in all respects had become acclimated to her new home. Max and Jo Ellen, together with Carol's mother, were able to successfully resolve Teresa's earlier emotional problem. Teresa developed a good relationship with Max and Jo Ellen's other two children, Kyle and Jamey, referring to them as her brother and sister. Teresa and Jamey played on a soccer team together and were members of a church youth group. Teresa also became a member of the Brownies. Teresa had not been involved in any of these activities while living with Carol. The evidence also showed that the family regularly attended church together and often went on family outings. In addition, both Max and Jo Ellen showed a strong interest in Teresa's schoolwork. Max frequently helped Teresa with her homework, while Jo Ellen met on a regular basis with Teresa's teachers to discuss her progress in school. Also, both Jo Ellen and Max attended the open houses which were held at the school. In short, the evidence clearly showed Teresa to be a happy and content 9-year-old living in a very loving and stable family environment.
Section 610(b) of the Illinois Marriage and Dissolution of Marriage Act (the Act) provides in pertinent part:
"[T]he court shall not modify a prior custody judgment unless it finds by clear and convincing evidence, upon the basis of facts that have arisen since the prior judgment or that were unknown to the court at the time of entry of the prior judgment, that a change has occurred in the circumstances of the child or his custodian * * * and that the modification is necessary to serve the best interest of the *497 child. * * *" (Ill. Rev. Stat. 1983, ch. 40, par. 610(b).)
Following the hearing, the trial court here transferred permanent custody to Max by way of a verbal order which was later reduced to a written order. In its written order, the court did not specifically state that it had found a change in circumstances, although the court did expressly find that it was in Teresa's best interest to have custody awarded to Max. The appellate court reversed, finding that the evidence failed to clearly and convincingly establish that a change in custody was necessary to serve the child's best interest.
Max contends that it was not necessary for the trial court to specifically find that a change in circumstances had occurred in order to modify the original custody judgment. Citing De Franco v. De Franco (1978), 67 Ill. App.3d 760, and Schultz v. Schultz (1976), 38 Ill. App.3d 678, he argues that since a full hearing was not held when custody was originally awarded to Carol, the trial court was free to exercise its initial discretion under section 602 of the Act, pertaining to original custody determinations. Section 602 provides that the court is to consider all relevant factors and determine custody in accordance with the best interest of the child. Ill. Rev. Stat. 1983, ch. 40, par. 602.
We fail to see the rationale in Max raising this argument. The appellate court did not reverse on the basis of the trial court's failure to make a specific finding of a change in circumstances. Indeed, the appellate court observed that "[a]lthough the judgment appealed from does not expressly specify what the change in circumstance in this case was, the record before us establishes clearly and convincingly that a change has occurred * * * which would permit modification." The court was not "persuaded," however, that the evidence clearly and convincingly showed that a change in custody was necessary to *498 serve the child's best interest. In any event, whether the trial court can exercise its initial discretion under section 602 in a custody-modification proceeding where custody was originally achieved by agreement of the parties is a question we need not decide, for we conclude that the trial court here made findings sufficient to satisfy the more stringent requirements of section 610(b).
In its written order the court found, inter alia, that on numerous occasions Carol displayed "poor judgment" in her care of Teresa, including engaging in sexual intercourse with Ed Boyd prior to marriage while Teresa was in the home and "may have heard verbal expressions of such conduct"; that Ed had been experiencing emotional problems from the time he began living with Carol to the time of the court hearing; that Ed was not seriously looking for employment and would therefore be present in the home a majority of the time; that Ed's use of force against Teresa on at least two separate occasions reveals his emotional instability; that Carol's actions while she had custody were not in Teresa's best interest; and that Carol's home was unstable, especially when compared to the environment provided by Max and Jo Ellen. These findings, we believe, when taken together, are sufficient to show that a change in circumstances had occurred. They are circumstances that did not exist when custody had been granted to Carol. We note also that, in its oral ruling, the court specifically found that in light of Carol's actions while she had custody, "Teresa did undergo a change." Since we conclude that the change-in-circumstances requirement was satisfied in this case, the issue thus becomes whether a transfer in custody was necessary to serve the child's best interest.
Determining where custody should lie in a particular case is a matter which rests within the sound discretion of the trial court. (Rodely v. Rodely (1963), 28 Ill.2d 347, 350.) Under section 610(b) the court must find by *499 clear and convincing evidence that a change in custody is necessary to serve the best interest of the child. (Ill. Rev. Stat. 1983, ch. 40, par. 610(b).) Once the court concludes that a change in custody is necessary, great deference must be accorded that decision, since the trial court is in the best position to judge the credibility of the witnesses and determine the needs of the child. (In re Marriage of Spangler (1984), 124 Ill. App.3d 1023, 1028.) It is not for a reviewing court to try the case de novo but merely to determine whether the trial court's transfer of custody constituted an abuse of discretion. In other words, the question for the reviewing court is whether the trial court's decision is contrary to the manifest weight of the evidence. Our appellate court has defined the role of a court of review in custody cases such as this as follows:
"Section 610(b) reflects an underlying policy favoring the finality of child-custody judgments and making their modification more difficult. Its effect is to create a legislative presumption in favor of the present custodian, thereby promoting the stability and continuity of the child's custodial and environmental relationship which is not to be overturned lightly. [Citations.] However, once the trial court has determined that the presumption has been overcome, the court of review will not disturb that determination on appeal unless the trial court's decision was contrary to the manifest weight of the evidence or amounted to an abuse of discretion." (In re Marriage of Wechselberger (1983), 115 Ill. App.3d 779, 786.)
See also In re Custody of Dykhuis (1985), 131 Ill. App.3d 371, 373; In re Marriage of Friedman (1981), 100 Ill. App.3d 794, 803; In re Custody of McIntyre (1981), 97 Ill. App.3d 777, 779.
In this case, the court found the changes in the situation of the custodial parent, Carol, detrimental to Teresa's best interest. It also found that Carol's home was unstable, particularly since Ed was experiencing emotional *500 problems. In contrast, the court was greatly impressed with the environment provided by Max and Jo Ellen and with Teresa's social and emotional development while living in their home. In addition, in its oral ruling the court expressed concern over Ed's use of excessive force against Teresa. Although the court was unwilling to say that Ed was violent, and while acknowledging that he had promised not to spank Teresa again, the court remarked that, "then again, I've got to judge things by the past * * * and I have to be concerned with the well-being of Teresa as a paramount consideration here under the circumstances." Given the court's findings and the record in this case, we cannot say that the court's decision to modify the earlier custody judgment constituted an abuse of discretion or was contrary to the manifest weight of the evidence. Indeed, we believe the evidence clearly and convincingly rebutted the presumption in favor of the original custodial order and established that a change in custody was necessary to serve Teresa's best interest. Accordingly, we hold that the trial court did not err in transferring custody to Max.
Another issue that is raised here, but which was not addressed by the appellate court, is whether the trial court erred in failing to make any provision for the payment of child-support arrearage owed by Max. At a separate hearing on Carol's petition for an order to show cause, the trial court found Max to be $2,220 in arrears in his support payments. When Carol's attorney asked if the court was going to provide for any method of payment, the court replied: "I don't think that's up to the court at this time. I'm just entering Judgment on it now, and, you know, you can proceed from there."
Carol maintains that the court had not only the authority but the obligation to establish a method of payment for the arrearage. To support this allegation she relies on section 505(b) of the Act, which states in part *501 that the "[f]ailure of either parent to comply with an order to pay support shall be punishable as in other cases of contempt. * * *" Ill. Rev. Stat. 1983, ch. 40, par. 505(b).
We find no merit to Carol's argument. The record reveals that there was a legitimate dispute over the amount of arrearage which Max owed. As a result, the focus of the hearing was on resolving that dispute. After hearing the respective arguments, the court determined that Max was $2,220 in arrears and entered judgment for that amount. The court did not find Max to be in contempt, and thus section 505(b) has no application to this case. Instead, this is simply a situation in which the court entered judgment for a specified sum. Under the circumstances there was no requirement that the court make any provision for the payment of the judgment. If it remained unpaid, Carol was free to take the necessary steps to have the judgment enforced.
For the reasons stated above, the judgment of the appellate court is reversed, and the judgment of the circuit court of Bond County is affirmed.
Appellate court reversed; circuit court affirmed.
JUSTICE SIMON, specially concurring:
I concur in the result in this case because, in its order, the circuit court listed ample facts to support its finding of a change in circumstances sufficient to warrant a change in custody without relying on any sexual conduct in which the plaintiff may have engaged. I am concerned, however, that the focus in the majority opinion on the plaintiff's private sexual experiences may be misread as a revitalization of Jarrett v. Jarrett (1979), 78 Ill.2d 337. It is highly speculative whether the child with whose custody we are concerned was even aware of the incident referred to by the plaintiff's brother (108 Ill. *502 2d at 494, 498), much less adversely affected by it. I therefore fail to see its relevance in the court's disposition of the case.