*In re* MARRIAGE OF JERI SUE DUNN, f/k/a Jeri Sue Herron, Petitioner-Appellant, and KEVIN M. HERRON, Respondent-Appellee.

Fifth District   No. 5—90—0006

Opinion filed February 26, 1991.

Steven E. Katzman, of Belleville, for appellant.

William C. Norton, of Conn, Clendenin, Norton & Farris, of Marrissa, for appellee.

JUSTICE HARRISON delivered the opinion of the court:

Petitioner, Jeri Sue Dunn, formerly Herron, appeals from the orders of the circuit court of Randolph County, entered October 10 and December 11, 1989, modifying custody with respect to the minor child of her marriage to respondent, Kevin M. Herron, and denying her motions to vacate or modify judgment. The parties' marriage was dissolved by order of the circuit court of Randolph County on June 29, 1984, and petitioner was given permanent custody of the parties' minor child, Mindy Sue Herron. On January 12, 1989, respondent filed a petition to modify the custody order, alleging a substantial change of circumstances affecting the best interests of the minor child, to wit: (1) that petitioner has not been providing a good home environment or proper adult supervision for the minor child; (2) that the minor child is not happy or well adjusted living with petitioner and prefers to reside with respondent; and (3) that the minor child was voluntarily placed by petitioner in the custody of respondent on or about November 1, 1988.

■■ At issue here is whether the circuit court's granting of the custody modification petition was against the manifest weight of the evidence and an abuse of discretion under the provisions of section 610(b) of the Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1989, ch. 40, par. 610(b)). That section provides in pertinent part:

"The court shall not modify a prior custody judgment unless it finds by clear and convincing evidence, upon the basis of facts that have arisen since the prior judgment *** that a change has occurred in the circumstances of the child or his custodian *** and that the modification is necessary to serve

the best interest of the child." Ill. Rev. Stat. 1989, ch. 40, par. 610(b).

■ Custody modification under section 610(b) is based on a legislative presumption in favor of the present custodian in order to promote stability and continuity in the child's environment. However, once the trial court has determined that this presumption has been overcome, a court of review will not disturb that determination unless the trial court's decision was contrary to the manifest weight of the evidence or amounted to an abuse of discretion. *In re Marriage of Wechselberger* (1983), 115 Ill. App. 3d 779, 786, 450 N.E.2d 1385, 1389-90.

At the hearings held in this matter on September 14 and 21, 1989, extensive evidence was presented. Testimony by witnesses in support of respondent's petition can be summarized as follows. Reverend Ralph Mehring, retired minister of St. John Lutheran Church in Sparta, Illinois, testified that respondent was a member of his congregation and had served on the church's finance committee. Respondent brought his daughter Mindy with him to church on a regular basis and she attended Sunday school. Rev. Mehring felt that respondent and Mindy had a close and loving relationship.

George Houston, district supervisor for the St. Louis County Department of Highway and Traffic, testified that respondent had worked under his direction for 2½ years. Houston described respondent as a hard worker and a very dependable, responsible person. Peter Schwent, one of respondent's co-workers, testified that he had known respondent since he began his employment with the highway department. Schwent and his wife occasionally socialized with respondent and his second wife, Nancy, and on some of those occasions Schwent had observed Mindy at respondent's home. Schwent felt that respondent and Mindy had a normal parent-child relationship and that Mindy appeared to be healthy and well adjusted.

Clinical psychologist Dr. Daniel Cuneo testified as an expert witness, having been ordered by the court to prepare an evaluation and report concerning the best custodial arrangement for the minor child. Based upon his evaluation and interviews, Dr. Cuneo stated that it would be in Mindy's best interest for respondent to have primary physical custody. Dr. Cuneo believed that respondent was a more psychologically stable parent and could better provide the stability needed by the minor child. In Dr. Cuneo's opinion, petitioner had led a "rather chaotic lifestyle" which may have been one of the primary factors that led to problems Mindy had experienced in kindergarten. Dr. Cuneo credited respondent's work with Mindy as being one of the

main reasons for an improvement in her school work.

Dr. Cuneo further testified that Mindy, age six, had indicated a preference to live with her father, although she expressed a love for both parents. Mindy told Dr. Cuneo that her mother sometimes whips her, but expressed a greater fear of her mother's ex-husband, Michael Dunn, who, she stated, "whips hard."

Although Dr. Cuneo admitted that petitioner was a fit parent, he felt that her thinking was confused and that her life was "in a state of flux." Dr. Cuneo concluded:

> "Jeri Dunn may try her best. She just hasn't been able to provide the structure the child needs. That doesn't make her a bad person. It's *** what would be the better place for this child and this child did suffer some difficulties, some things we can actually measure; and I didn't feel that it was worth taking the risk to see what else we could do to this kid."

Dwight Baue, age 20, testified that he first met petitioner in May 1989, through her job at Pizza Hut in Sparta, Illinois. Shortly thereafter, petitioner invited Baue to her home for a small party. Several weeks later, Baue and petitioner were supposed to go on a picnic but instead went to her trailer, where they ate and Baue consumed "eight small bottles" of beer. Because petitioner had to work that night, Baue volunteered to baby-sit Mikey, petitioner's child from her second marriage. Baue told petitioner that he had to get a load of merchandise from the airport for his employer and could take Mikey along with him.

Baue subsequently accepted employment with a barge line and went to petitioner's trailer to tell her good-bye. Another of petitioner's male friends came by and, after talking together for a while, petitioner left with this friend. Baue, who did not know petitioner was leaving, felt obliged to stay and watch Mikey, since the child was awake and petitioner's sleeping brother was the only other person in the trailer. Baue put Mikey to sleep and finally left around midnight, although petitioner had not yet returned.

Baue returned to Sparta 10 days later, after suffering an injury on the barge, and was invited by petitioner to her apartment, where he spent the night. Thereafter, Baue lived with petitioner for approximately one month, sometimes baby-sitting for the children while petitioner was at work. Baue testified that during the time he lived with petitioner, she had approximately six late night parties with her co-workers from Pizza Hut.

Baue further testified that petitioner told him her ex-husband Michael Dunn had once pushed her against a cabinet, resulting in a

two-inch scar on her back. Baue moved from petitioner's residence after she began feeling sick in the mornings, although denying she was pregnant. Additionally, Baue claimed to have caught "crabs" from petitioner. On cross-examination, Baue admitted that he had used cocaine several times in the past and that petitioner had voiced her disapproval when she learned of this behavior.

Nancy Herron, respondent's second wife, testified that she and respondent had dated since 1984 and were married on April 15, 1989. Mrs. Herron, who was employed as a corporate travel agent, stated that she had made arrangements for after-school child care for Mindy in the event that respondent were to be awarded custody. Mrs. Herron described her relationship with Mindy as a very good one. Although Mrs. Herron believed that Mindy was basically physically and mentally healthy, she stated that there had been times when they would pick Mindy up from petitioner's house and she would be dirty. During recent periods of visitation, Mrs. Herron noticed that Mindy was nervous and experienced difficulty sleeping.

Respondent testified that he had been employed as an equipment operator by the St. Louis County Highway and Traffic Department for 2½ years, working from 8 a.m. to 4:30 p.m. and earning an approximate net income of $1,000 per month. Respondent stated that since the divorce, he has always paid child support and exercised his visitation privileges.

Respondent further testified that on the day before Thanksgiving, 1988, petitioner took Mindy to the home of respondent's mother, saying that she didn't want Mindy anymore. Respondent, who was living with his parents in Sparta, Illinois, believed that petitioner intended to give him permanent custody of Mindy, and had her sign a note forfeiting child support for Mindy "while [respondent] is caring for her during the school year or until she comes back home with me." Prior to the transfer of custody, Mindy had been attending kindergarten at Trico School in Percy, Illinois. The parties had discussed the fact that Mindy was doing poorly there, and after Mindy was enrolled in the Sparta school system, respondent helped her with her school work.

Respondent stated that on January 8, 1989, petitioner reasserted and took custody of Mindy and immediately thereafter he instituted this custody modification action out of concern for his daughter's wellbeing. Respondent admitted that because petitioner had moved to Sparta prior to resuming her custody of Mindy, Mindy has remained in the same school, where, he believes, she could receive a good education.

Numerous witnesses also testified on behalf of petitioner. Fleta

Gordon testified that she had been employed as a teacher at the Sparta Primary Attendance Center for 21 years. Mrs. Gordon was Mindy's kindergarten teacher from the end of November 1988, until the end of May 1989. At first, Mindy was very far behind the other children, but made "tremendous progress within the first few weeks in Sparta, almost faster than any child I had seen before." Mrs. Gordon had conferences with both parties during the school year and saw no regression in Mindy's progress after she began living with petitioner again.

Stacey Diercks testified that she was a 16-year-old high school student who occasionally baby-sat for Mindy and Mikey during June and July 1989. Petitioner always left something for the children to eat and her apartment and the children's clothes were always clean. During the time she baby-sat, Ms. Diercks did not notice anyone else living with petitioner and her two children.

Michael Dunn, Sr., testified that he and petitioner were married on July 6, 1984, seven days after petitioner's divorce from respondent. Dunn and petitioner divorced in September 1988, and petitioner retained custody of their child, Michael S. Dunn II. However, the couple began seeing each other again in October 1988 and had maintained a relationship since that time. Dunn stated that he was the father of the child that petitioner was carrying at the time of the hearing, and that the two of them planned to remarry in December 1989. Dunn, a self-employed truck driver, denied ever physically abusing petitioner. Dunn felt he had a good relationship with Mindy, but admitted spanking her several times.

Petitioner testified that she had been employed at Pizza Hut since February 1, 1989. Because she usually works during the day, her schedule allows her to take Mindy to and from school and help with some of her Brownie activities. Petitioner stated that she decided to let Mindy live with respondent in November 1988, because she had talked with his mother and they had decided to enroll Mindy in school in Sparta, due to her difficulties in kindergarten at the Trico School. Petitioner testified that the agreement with respondent was that Mindy would stay with him at his mother's home only until the end of the school year and that petitioner would move to Sparta as soon as she got a job and a place to live. During the time that Mindy lived with respondent, petitioner had visitation every weekend. Petitioner stated that while Mindy was spending Christmas vacation with her, Mindy told her that she wanted to live with petitioner rather than with her father.

Petitioner further testified that she had never had sex with

Dwight Baue and that he had never lived with her. Although she admitted that Baue had stayed overnight at her house several times, he was always in the company of Fern Aud, a friend of petitioner's and the woman whom Baue was dating. Petitioner further admitted that she was warned by the manager of her apartment complex for violating a rule concerning additional persons staying in the apartment for an extended period of time. Petitioner noted, however, that she was cited for having two additional guests. Petitioner stated that she had recently gotten into an argument with Baue when she learned that "he smokes pot and he snorted cocaine." Petitioner had tried to persuade Ms. Aud not to see Baue anymore because of the drug usage, and when Baue found out, he became angry with petitioner and told her that he would get even with her.

Petitioner testified that she began dating Michael Dunn after she had separated from respondent in April 1984. Petitioner denied that Dunn had ever abused her, although she stated that respondent had done so on several occasions during their marriage. Petitioner described the relationship between Mindy and Dunn as being "very close" and felt that Mindy and her brother Mikey were "inseparable." Petitioner testified that she had moved six times since her divorce from respondent in 1984, but explained that several of the moves were necessitated by Mindy's educational needs and by her marriage to and subsequent divorce from Dunn.

Bonnie Jacoby, petitioner's mother, testified that she often baby-sits for Mindy and Mikey while petitioner is at work. Mrs. Jacoby believes that petitioner takes very good care of her children and has always kept them neat and clean. Mrs. Jacoby had seen Dwight Baue with Fern Aud several times at petitioner's apartment, but did not believe that petitioner had ever dated him. Mrs. Jacoby further testified that she was relieved when petitioner ended her marriage to respondent, but was upset when petitioner and Michael Dunn divorced. Mrs. Jacoby denied that Dunn had ever abused petitioner, but related one instance during petitioner's marriage to respondent where she observed "hold marks" or bruises on petitioner's wrists.

Crystal Povolish testified that she had been petitioner's neighbor since June 1, 1989. In early June, Ms. Povolish observed Dwight Baue leaving petitioner's residence and was told by petitioner that Baue was "Fern's boyfriend." Although Ms. Povolish was not aware of any parties held at petitioner's apartment, she admitted that she sometimes worked evenings. Ms. Povolish stated that she has often seen Michael Dunn at petitioner's apartment and felt that he was very nice to the children.

Elizabeth Stork, petitioner's maternal grandmother, testified that she also helped baby-sit for the children on a weekly basis when petitioner was working. Mrs. Stork stated that during a Christmas dinner celebration at her home, Mindy seemed upset. When Mrs. Stork asked Mindy what was wrong, Mindy, who was then living with respondent, told Mrs. Stork that she wanted to live with her mother. Mrs. Stork offered to let petitioner and her children move into her home in Sparta until petitioner could find a place of her own. Petitioner moved into the Stork home in early January 1989 and lived there until the end of March 1989. On several occasions during that time, respondent used loud, vulgar language and called petitioner derogatory names in front of Mindy upon returning her from visitation periods. Mrs. Stork has observed Michael Dunn interacting with petitioner's children on numerous occasions and stated that he is both gentle and kind when correcting them. Mrs. Stork had never seen Dunn be unkind to petitioner.

■ It is not for a reviewing court to try the case *de novo.* (*In re Custody of Sussenbach* (1985), 108 Ill. 2d 489, 499, 485 N.E.2d 367, 371.) Once the trial court concludes that a change in custody is necessary, great deference must be accorded that decision, since the trial court is in the best position to judge the credibility of the witnesses and determine the needs of the child. (108 Ill. 2d at 499, 485 N.E.2d at 370.) Here, the trial court held that a change had occurred in the circumstances of the parties and the minor child which would permit modification. The trial court believed the evidence clearly and convincingly established that petitioner has not been providing a good home environment or proper adult supervision for Mindy and that Mindy may indeed be adversely affected by continued exposure to petitioner's lifestyle.

■ Petitioner argues that in attempting to prove that she had not been providing a proper home environment, respondent relied primarily on the testimony of Dr. Cuneo and Dwight Baue. In answer to petitioner's contention that Baue's testimony was incredible, we note that the change-in-circumstances finding could have been made by the court without reliance on Baue's claims. In custody modification proceedings, the examining psychologist's testimony is entitled to great weight. (See *In re Marriage of Dilley* (1984), 127 Ill. App. 3d 992, 996-98, 469 N.E.2d 674, 677-78.) Here, according to Dr. Cuneo's expert testimony and report, petitioner's actions while she had custody of Mindy were not always in Mindy's best interest.

■ Petitioner and Mindy had resided in seven separate locations in the five years since the parties' marriage was dissolved. Although

the ill effects of a custodial parent's changes in residence need not manifest themselves before a court can alter a child's custody (*In re Marriage of Pease* (1982), 106 Ill. App. 3d 617, 620-21, 435 N.E.2d 1361, 1365), here Dr. Cuneo believed that petitioner's "rather chaotic lifestyle" was primarily responsible for Mindy's problems in school.

Additionally, petitioner had married, divorced and was planning to remarry Michael Dunn, a man whom Mindy feared because he "whips hard." Most importantly, however, Dr. Cuneo believed that petitioner's home was unstable, especially when compared to the environment provided by respondent and his second wife, Nancy. These findings, when taken together, are sufficient to show that a change in circumstances had occurred since custody had been granted to petitioner. See *Sussenbach*, 108 Ill. 2d at 498, 485 N.E.2d at 370 (change in circumstances occurred that justified change in custody of child from mother to father where mother's new husband had emotional problems and had used force against child on at least two separate occasions, mother's home was unstable, and father's home provided stable environment).

■ The trial court was also convinced the evidence clearly established that a modification awarding custody to respondent was necessary to serve Mindy's best interest. The stability of the environment is an important factor in determining a child's best interest. (*Pease*, 106 Ill. App. 3d at 620, 435 N.E.2d at 1365.) Here, the court, in its December 11, 1989, order, adopted Dr. Cuneo's finding that "it would be in the best interests of Mindy Sue Herron for her primary physical custody to be placed with her father, Kevin M. Herron, the Respondent herein." The court further agreed with Dr. Cuneo that "Kevin M. Herron was the more psychologically stable parent and can better provide for the stability that Mindy Sue Herron needs in her life." The court concluded that respondent is well able to provide a good and proper home and environment for Mindy wherein she would receive the "proper care, moral and religious training and *** support."

Given the court's findings and the record in this case, we cannot say that the court's decision to modify custody constituted an abuse of discretion or was contrary to the manifest weight of the evidence. Accordingly, the orders of the circuit court of Randolph County are affirmed.

Affirmed.

RARICK, P.J., and WELCH, J., concur.