NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2022 IL App (4th) 210731-U

NO. 4-21-0731

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
May 16, 2022
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the |
| CHARLES Y., | ) | Circuit Court of |
|       Petitioner-Appellant, | ) | Champaign County |
|       v. | ) | No. 20D275 |
| KASSANDRA Y., | ) | |
|       Respondent-Appellee. | ) | Honorable |
| | ) | Sam A. Limentato, |
| | ) | Judge Presiding. |

JUSTICE STEIGMANN delivered the judgment of the court.
Justices Turner and Cavanagh concurred in the judgment.

**ORDER**

¶ 1   *Held:*   The appellate court affirmed the trial court's order allocating parenting time and decision-making responsibilities because the order was not against the manifest weight of the evidence.

¶ 2         Petitioner, Charles Y., and respondent, Kassandra Y., have one child in common—K.M.Y., who was born in October 2015. In July 2020, Charles filed a petition for dissolution of marriage against Kassandra seeking (1) a "reasonable" division of parenting time and (2) joint decision-making responsibilities of K.M.Y. In November 2021, the trial court entered an order allocating to Kassandra (1) the majority of parenting time and (2) primary decision-making responsibility for the areas of education and health. The court allocated joint decision-making responsibilities in the areas of extracurricular activities and religion.

¶ 3         Charles appeals, arguing the trial court's order was against the manifest weight of the evidence. Charles contends the court misconstrued the evidence regarding primary caretaking,

particularly the evidence that Charles traveled for his music career in the years before the petition for dissolution was filed. Charles also asserts the trial court (1) under-emphasized Charles's willingness to foster a relationship between K.M.Y. and Kassandra and (2) discounted evidence that Kassandra had a pattern of actively interfering with K.M.Y.'s relationship with Charles. We disagree and affirm.

¶ 4                                    I. BACKGROUND

¶ 5            As an initial matter, Kassandra claims Charles's brief fails to include a sufficient statement of facts with citations to the record in violation of Illinois Supreme Court Rule 341(h)(6) (eff. Oct. 1, 2020). Although Charles's brief arguably meets the minimum requirements of Rule 341, we need not address the issue because the trial court's final order contains a thorough and detailed recitation of the necessary procedural and factual background. The following information is largely taken from the trial court's comprehensive order dated November 2021.

¶ 6                              A. Procedural History

¶ 7            In July 2020, Charles filed a petition for dissolution of marriage. Two days later, Kassandra petitioned for and obtained an emergency order of protection for herself and K.M.Y. against Charles. In August 2020, a trial court denied Kassandra's request for a plenary order of protection. (For context, we note that Charles later asserted at trial that Kassandra denied Charles and his family any contact with K.M.Y. between June 2020 and September 2020.)

¶ 8            In September 2020, the trial court entered an agreed temporary order addressing parenting time. That order gave Charles parenting time (1) every Wednesday from 4 p.m. to Thursday at 9 a.m. and (2) every other weekend from Friday at 4 p.m. to Monday at 9 a.m. The temporary order did not address allocation of parental decision-making.

¶ 9            In September 2021, Kassandra filed a document titled "Petition on Parenting Time

Abuse," alleging Charles abused his parenting time when he returned K.M.Y. two or three hours late on a Monday morning. The petition attached a text message from Charles to Kassandra, explaining Charles thought K.M.Y. might have the COVID-19 virus and notifying Kassandra that he was going to get K.M.Y. tested.

¶ 10                                    B. The Evidentiary Hearing

¶ 11         In October 2021, over two days, the trial court conducted an evidentiary hearing to determine the issues of allocation of parenting time and decision-making. Each party requested the majority of parenting time and primary decision-making. The trial court summarized the most relevant testimony in its order as follows.

¶ 12                                    1. *The Parties' Testimony*

¶ 13                                    a. Charles

¶ 14         Charles testified he was 33 years old and lived in the marital residence in Champaign, Illinois. Since November 2019, Charles worked at the University of Illinois 4H Extension in Decatur, Illinois, where he was involved with youth and family services in the Decatur public schools. His hours were 8 a.m. to 4:30 p.m., Monday through Friday. Charles worked from home on Mondays, Wednesdays, and Fridays. He earned about $3000 a month. Charles was also expected to receive a master's degree in social work in May 2022.

¶ 15         Charles's employment history included working for the Champaign County Juvenile Detention Center and as an outside vendor for the Illinois Department of Children and Family Services (DCFS). Charles also previously worked at a barbershop in 2017 but at the time of the hearing saw clients only once a week at his home, usually on Saturday mornings.

¶ 16         On cross-examination, Charles testified that for the past 10 to 12 years, he had worked in the music industry as a rap artist. Charles acknowledged that he has had a fair amount

of success as an entertainer, on occasion opening for nationally known artists. Charles agreed that he traveled to perform "a couple of times" since K.M.Y.'s birth and claimed he was gone for "a day or two tops, but it wasn't that often. It was pretty spaced out because I knew I had a kid." Charles stated that before he filed the petition for dissolution, he was booked as an opening act about once a month and only in the Midwest. When asked how often he traveled for shows in the two years prior to filing for dissolution, Charles answered, "about six, seven times." Charles stated that he had not performed since 2019.

¶ 17        Charles testified he was "[r]enting to own" the marital home, which cost $1000 a month. The home had four bedrooms, including a bedroom and separate playroom for K.M.Y. When K.M.Y. was not with him, Charles lived by himself with a pet cat.

¶ 18        According to the trial court's order, "[Charles] is extremely concerned about education and taught [K.M.Y.] how to read." K.M.Y. was in some form of daycare or preschool for most of her life. In 2018-2019, K.M.Y. attended daycare at the Parkland College Child Development Center, and in 2019-2020, she attended Canaan Academy. While K.M.Y. was at Canaan, Charles testified that he attended every parent-teacher conference, a fall festival, a carnival, and many other such activities hosted by the school. Charles acknowledged that Kassandra also attended all parent-teacher conferences and attended school events when her work schedule allowed. On cross-examination, Charles could remember only two or three of the daycare and school workers involved in watching K.M.Y.

¶ 19        Charles testified to the following concerning the parties' caretaking before they separated in March 2020. Charles stated that he primarily gave K.M.Y. baths, did most of the laundry, and was usually the one to schedule play dates. Charles acknowledged that Kassandra did the grocery shopping and frequently cooked meals. Charles stated that he cooked about five meals

a week when the weather was warm enough to grill.

¶ 20        Charles further testified that he primarily helped K.M.Y. with her health needs. Charles's mother recommended K.M.Y.'s pediatrician, and K.M.Y.'s dentist had treated Charles's family for over a decade. Charles explained that because both he and K.M.Y. had asthma, he picked up her prescriptions and administered her inhaler and nebulizer treatments. Charles acknowledged that K.M.Y had seasonal allergies but denied that she was allergic to cats.

¶ 21        Charles acknowledged that both parents took K.M.Y. to the library and bought her clothes, but he maintained that he dressed K.M.Y. every morning. Charles further acknowledged that both parents agreed to enroll K.M.Y. in gymnastics and both he and Kassandra attended those events. However, Charles could not remember the names of any of K.M.Y.'s gymnastics instructors when asked.

¶ 22        Charles testified he began taking K.M.Y. with him to his boxing gym when she turned one. About three or four times a week, Charles boxed—purely for exercise—and bonded with K.M.Y. through boxing. K.M.Y. began taking classes as soon as they were available, around age two, and frequently watched or otherwise helped in some way when Charles worked out.

¶ 23        Charles further testified that Kassandra would take K.M.Y. to the park and various family events and holidays. Likewise, on weekends, Charles took K.M.Y. to his family's events, boxing, and church with Charles's parents every Sunday. Kassandra attended some of the family events and church but stopped attending church at the end of 2019.

¶ 24        Charles testified extensively about Kassandra's behavior both before and after they separated. Charles testified that in 2016, he came home over the lunch hour to find K.M.Y., just a few months old, lying screaming on the floor in the couple's bedroom. Kassandra was sound asleep, and Charles had a hard time waking her up. An argument ensued, and Charles got into a

confrontation with Kassandra and her family members. Eventually, Kassandra left with K.M.Y. and did not return for three weeks. The trial court noted in its order that the couple stayed together and got married about 18 months later.

¶ 25 Charles testified that Kassandra worked at an AT&T call center in Rantoul, Illinois, beginning in November 2019. In the eight months prior to the filing of divorce proceedings, Charles claimed that Kassandra typically worked from noon to 9 p.m. and went out after work with friends most nights. He asserted that Kassandra typically returned home at 11 p.m. or later and would only spend time with K.M.Y. three nights a week.

¶ 26 Charles further testified about his concerns with Kassandra's alcohol consumption, claiming it was not uncommon for Kassandra to still be intoxicated in the mornings after she hung out with friends. The trial court noted in its order that Charles testified he never attempted to stop Kassandra from driving K.M.Y. to school or daycare despite his apparent concerns.

¶ 27 Charles believed that Kassandra was not willing to foster a relationship between K.M.Y. and him based on Kassandra's withholding from Charles for four months parenting time and communication with K.M.Y., including an entire month after Kassandra's plenary order of protection was denied. Charles requested the majority of parenting time and primary decision-making because he insisted he was more flexible and willing to foster a relationship between K.M.Y. and Kassandra based on his repeated reasonable attempts to communicate with her (via the court-ordered TalkingParents web-based communication application) to solve minor issues.

¶ 28 Charles testified to an incident that occurred about a month prior to the evidentiary hearing, during which he failed to drop off K.M.Y. at school on Monday morning. Charles kept K.M.Y. with him that morning past the exchange time because he was concerned she had the

COVID-19 virus. Despite his concerns, he brought K.M.Y. with him to work before getting her tested and dropped her off with Kassandra a couple of hours later. Charles testified, and the trial court noted, that Charles was wrong to take K.M.Y. with him to work.

¶ 29 Charles further testified that K.M.Y. began seeing a "play therapist" in May 2021. The trial court's order states, "[Charles] acknowledges that the parties participated in mediation in October 2020 and no mention was made of counseling." However, Charles testified that he did discuss K.M.Y.'s seeing a child therapist during mediation. Charles decided to enroll K.M.Y. in play therapy without consulting Kassandra because Kassandra "told [him] to [his] face" she did not think K.M.Y. needed "counseling." Charles believed it was important for K.M.Y. to have a "third party"—by which he meant somebody without bias against either parent and who was there to listen only to K.M.Y.—to speak with honestly about her feelings and emotions pertaining to the divorce her parents were going through. Charles testified that K.M.Y. told Kassandra about the play therapy a week or two after it started and Kassandra never brought up or addressed the subject with Charles.

¶ 30 Charles discussed an incident in December 2020 when K.M.Y. broke her arm during his parenting time. Charles testified that K.M.Y. was chasing a friend and tripped over a box. Charles notified Kassandra of what happened through TalkingParents and told her he was taking K.M.Y. to the hospital. Kassandra later reported Charles to DCFS for the incident, but DCFS found the allegation unfounded. On cross-examination, Charles testified that he attended every follow-up appointment, even though they were scheduled during his work hours, but he could not remember the names of any of the physicians that treated K.M.Y. at the hospital or at check-ups.

¶ 31 b. Kassandra

¶ 32     Kassandra testified she was 29 years old and lived in a house owned by her grandfather in Urbana, Illinois. Kassandra testified that her mother, Kristin Landress, had been living with Kassandra since the beginning of 2021 and stayed at the home five nights a week. Kassandra testified that she had a high school diploma and some training in cosmetology and dialysis treatment. Kassandra admitted she was a smoker and K.M.Y. was asthmatic, but Kassandra denied smoking in front of K.M.Y.

¶ 33     Kassandra worked as a call representative for AT&T from November 2019 until her termination in December 2020. Thereafter, Kassandra had been unemployed and received $1130 in unemployment benefits every two weeks, although they were soon decreasing. Kassandra stated she was actively searching for employment but had been interviewed just twice in the past three months, both times for private in-home nursing care services. From January 2018 to December 2019, Kassandra worked at a dialysis treatment center in Rantoul.

¶ 34     Kassandra denied going out with friends every Wednesday through Sunday evening. She maintained that she did not (1) have people, other than her mother, spend the night at her residence or (2) spend any nights away from the residence. Kassandra agreed it was important for parents not to disparage each other in front of their children and denied (1) disparaging Charles or (2) attempting to hinder his relationship with K.M.Y.

¶ 35     Kassandra testified that she lived with Charles until February 2020. Kassandra and Charles had about 50/50 parenting time while they were separated and before the petition for dissolution was filed. Kassandra agreed she had never made any allegations of abuse against Charles before they separated. Kassandra testified Charles had threatened to withhold K.M.Y. from her on multiple occasions and, in March 2020, Charles told her he would not return K.M.Y. "if [Kassandra] did not do what he said."

¶ 36     Kassandra testified that when she came to the hospital after being notified that K.M.Y. had broken her arm, Charles would not tell her how it happened. On cross-examination, she was confronted with a copy of a message from Charles using TalkingParents that explained K.M.Y. had tripped over a box while playing and Charles was taking her to the hospital. Kassandra agreed she asked Charles if she could take K.M.Y. home that night, even though it was Charles's parenting time, because Kassandra was very concerned about K.M.Y. Charles agreed.

¶ 37     Regarding Charles's late exchange of K.M.Y. due to his COVID-19 concerns, Kassandra testified that she did not believe his concerns were serious because he said he was taking K.M.Y. with him to work. Kassandra acknowledged that she said she would call the police if Charles did not return K.M.Y. immediately and agreed that it would have been traumatic for K.M.Y. if the police would have gotten involved in her presence.

¶ 38     In August 2021, Kassandra enrolled K.M.Y. in kindergarten at a school three blocks from her home. Kassandra admitted she did not consult Charles before making this decision.

¶ 39     Kassandra believed that 50/50 parenting time would not work because Charles was not attentive enough to K.M.Y. and could not meet drop off times. When asked about Charles's requests for make-up parenting time due to his having the COVID-19 virus or dropping off K.M.Y. at school before 9 a.m., Kassandra said she wanted to stick to the court order and if Charles wanted a change he should have talked to their lawyers. Nonetheless, Kassandra agreed that lawyers did not need to get involved in every minor alteration or parenting time dispute.

¶ 40     Kassandra testified she was the primary caregiver for K.M.Y. since her birth. Kassandra dropped K.M.Y. off at school every morning when K.M.Y. attended Canaan Academy; she denied Charles picked K.M.Y. up from school. Kassandra testified that she took K.M.Y. to all her medical appointments and Charles sometimes tried to exclude Kassandra from the office

because he paid for their health insurance. Kassandra knew the names of all of K.M.Y.'s teachers and doctors. Kassandra also introduced an exhibit documenting Charles's touring dates in 2017 and 2018. In its order, the trial court wrote that Kassandra "testified and confirmed with an exhibit that [Charles's] testimony of a limited touring schedule for his music career was not accurate."

¶ 41                                    2. *Witnesses Called by Charles*

¶ 42        Brittany Sanders testified that she was the after-school coordinator at Canaan Academy when K.M.Y. attended during the 2019-2020 school year. Sanders stated she developed a relationship with K.M.Y. outside of school because she helped take care of and style K.M.Y.'s hair. According to Sanders, K.M.Y.'s hair was never detangled, so it was frequently painful for K.M.Y. when Sanders detangled her hair. Sanders testified that Charles mostly brought K.M.Y. to her house and he would stay until the process was complete. Sanders also testified that K.M.Y. was happy to see each parent when they picked her up from Canaan Academy and believed the pick-ups were "balanced" between the parents.

¶ 43        K.M.Y.'s paternal grandfather, Charles Y. Sr., testified that, until recently, Charles Sr. and his wife lived two or three blocks from the marital residence and saw K.M.Y. almost every time Charles had parenting time. Charles Sr. moved to Arizona two months before the hearing and testified via videoconferencing.

¶ 44        Charles Sr. testified that he did not see or have any contact with K.M.Y. between June and September 2020. However, starting in September 2020, he was involved in 95% of the parenting time exchanges with Kassandra. Charles Sr. testified that he got along with Kassandra but was concerned, based on his interactions with K.M.Y., that Kassandra was coaching K.M.Y. not to want to be around her father.

¶ 45                                    3. *Witnesses Called by Kassandra*

¶ 46                              a. Kristin Landess

¶ 47          Kristin Landess, Kassandra's mother, testified she was currently living with Kassandra. Between November 2015 and May or June 2016, Kristin lived with the parties at the marital home while she recovered from shoulder surgery. Kristin testified that while she lived with the parties, Kassandra took care of K.M.Y. 90 to 95% of the time and Charles 5% of the time. Charles was not home a lot during that period because he was working several jobs, including cutting hair and touring with other rap artists. Kristin further testified that in May 2018 she moved into an apartment at the same complex as the marital home and had daily contact with both parties during that period. Kristin testified that she worked three jobs totaling about 70 hours per week.

¶ 48          Kristin testified that in the 24 months before Charles filed the petition for dissolution, Kassandra took K.M.Y. to preschool 70% of the time, Kristin 20 to 25% of the time, and Charles 5 to 10% of the time. Kristin further testified that when Kassandra worked nights, Kristen would watch K.M.Y. because Charles also worked nights. Kassandra would pick up K.M.Y. from Kristin at about 9 p.m.

¶ 49          Kristin testified that since she had been living with Kassandra, Kassandra sometimes went out at night with friends but never returned intoxicated or had guests spend the night. Similarly, Kassandra did not regularly spend the night someplace other than her Urbana home, and Kristin had never seen Kassandra so intoxicated that she could not function in the morning.

¶ 50          Kristin had no concerns over Kassandra's parenting abilities. Kristin was concerned about Charles's "[l]ack of interest, taking care of [K.M.Y.] up until they separated and him just not being around to take on an active parenting role with [K.M.Y.]" Kristin testified that, while she was living with the parties, Charles was sometimes gone for weeks at a time while on tour for

his music career.

¶ 51                                              b. Scott Lerner

¶ 52        Scott Lerner testified he was appointed as a limited guardian *ad litem* (LGAL) in the case and had spoken to the parties, K.M.Y., and all of the witnesses the parties requested he interview. Lerner also reviewed the court file, various police reports, and other documentation. Lerner filed a report with the court that recommended Kassandra be allocated the majority of parenting time, with Charles continuing to have parenting time on Wednesdays and every other weekend. The report also recommended that the parties share significant decision-making responsibilities over all areas.

¶ 53        Lerner testified, consistent with his report, that he had concerns about Kassandra's withholding of parenting time via an emergency order of protection and her contacting DCFS over incidents that the responding authorities did not believe warranted further action. Lerner also expressed concern about Kassandra's allegations against Charles. Despite these concerns, Lerner believed that, as time went on, the parties would be able to learn to work together because they "lov[ed] their child more than they hate each other." Lerner testified that he believed both parents were fundamentally good people, caring parents, and had healthy, loving relationships with their daughter.

¶ 54                                              c. Stephanie Landess

¶ 55        Stephanie Landess testified she was Kassandra's step-mother and had known the parties for 15 years. She opined that Kassandra performed the majority of parenting duties during K.M.Y.'s life and Kassandra was the better caretaker. She also expressed concerns about (1) Charles's use of "weed and alcohol" and (2) the number of people coming in and out of Charles's home when he cut hair.

¶ 56                           d. Tylon Taylor

¶ 57        Tylon Taylor testified she had known both parties for the past five years and

Kassandra was Taylor's former manager at a prior employer. Taylor stated she saw Kassandra

about four to five times a week. Before the parties separated, she rarely saw Charles when she

visited because he was either in the basement or not home.

¶ 58                           e. Areanna Ellison

¶ 59        Areanna Ellison testified she was a friend of Kassandra and did not know Charles.

Ellison had worked with Kassandra at AT&T and stated that she saw Kassandra a few times a

month, always with K.M.Y., because their daughters played together. Ellison stated Kassandra

was a good mom.

¶ 60        Charles did not cross-examine Taylor or Ellison about Kassandra's afterwork

activities or alcohol consumption.

¶ 61                        C. The Trial Court's Findings

¶ 62        The trial court took the matter under advisement and issued a written order in

November 2021.

¶ 63                   1. *Significant Decision-Making Responsibilities*

¶ 64        In its order, the trial court addressed each of the statutory factors as required by

section 602.5(c) of the Dissolution of Marriage Act. See 750 ILCS 5/602.5(c) (West 2020). The

court concluded that the majority of the statutory factors were neutral and did not favor either

party. The court found that "the child's adjustment to his or her home, school, and community"

"slightly favor[ed]" Kassandra because K.M.Y.'s school was just three blocks away from

Kassandra's residence and K.M.Y. could be enrolled in that school for "years to come." Regarding

the level of past participation in decision-making from each parent, the court wrote the following:

"While the testimony was contradictory as presented by the parties themselves, the observations of several witnesses also must be considered. So, after considering the totality of testimony and credibility of parties and witnesses, and while both parents have, and remain, involved in decision-making with respect to the child, [Kassandra] appears to be the more consistent caretaker of the child. Therefore, this factor favors [Kassandra]."

¶ 65    The trial court concluded that both parents were able to meet K.M.Y.'s needs based on the "apparent success of the Temporary [Custody] Plan and lack of evidence demonstrating otherwise." The court expressed concerns about the ability of the parties to cooperate in the parenting arrangement but ultimately believed "each seems to be able to comply with court ordered parameters and have done so with reasonable success for the last year or so."

¶ 66    The trial court engaged in an extensive analysis of two factors: (1) "the ability of the parents to cooperate to make decisions, or the level of conflict between the parties that may affect their ability to share decision-making" and (2) "the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child." 750 ILCS 5/602.5(e)(3), (11) (West 2020). As to the first factor, the court expressed concern about the behavior of both parties. The court noted that Kassandra had withheld visitation from Charles, although some of that time was covered by a valid emergency order of protection. Kassandra had also called DCFS to report Charles when K.M.Y. broke her arm in what all parties ultimately agreed was an accident. The court also noted that Kassandra (1) filed a petition for parenting time abuse over a delay of less than 2½ hours despite a year of parenting time exchanges with no issues and (2) enrolled K.M.Y. in a particular school without consulting Charles.

¶ 67    For his part, the trial court noted Charles (1) allegedly threatened to withhold

K.M.Y. from Kassandra, (2) enrolled K.M.Y. in counseling without consulting Kassandra, and (3) delayed returning K.M.Y. purportedly out of COVID-19 concerns but still took K.M.Y. to work instead of a medical facility or staying home. The court did believe Charles's acknowledgment that he acted in error was potentially mitigating.

¶ 68        The trial court concluded its discussion of this factor as follows:

> "Both parties demonstrate significant sensitivity and defensiveness as to all elements of co-parenting, and their ability to cooperate or to extend some flexibility seems rather limited.
>
> However, while the Court has concerns about both parents regarding their conduct in this area, this factor does slightly favor [Charles]."

When analyzing the related factor of the course of conduct between the parties regarding decision making, the court believed "the course of conduct over the last year seems to demonstrate independent, rather than cooperative, exercise of decision-making by each parent without consultation with the other."

¶ 69        Regarding the ability of each parent to foster a relationship between the child and the other parent, the trial court again found the parties' behavior concerning. The court noted Kassandra's withholding of parenting time demonstrated an unwillingness to facilitate a relationship. Nonetheless, the court concluded that "this event happened more than a year ago, and the parties have been successful in implementing shared parenting time since them."

¶ 70        The trial court was critical of Charles's decision to level accusations against Kassandra at the hearing without attempting to corroborate them. Specifically, the court noted Charles had the right to emphasize Kassandra's negatives but he then had a burden to provide evidence in support of his assertions. Charles did not call independent witnesses or challenge

Kassandra's witnesses at trial. The court implied this strategy and the failure to follow through negatively affected Charles's credibility.

¶ 71　　　The trial court concluded as follows:

"Neither parties' alleged conduct is completely excused or ignored by the Court, but their conduct is mitigated by the passage of time and, significantly, by a lack of evidence that their mutual damaging conduct has continued. This factor remains so close as to not favor either party, and the Court, much like the LGAL, hopes that each party's willingness and ability in this area improves for the sake of their child's best interest in the short and long term."

¶ 72　　　The trial court also addressed the LGAL's report and recommendation. After noting the LGAL recommended joint decision-making in all areas, the court explained that it "has had the benefit of testimony from the parties and their witnesses to supplement the LGAL report, and that additional cumulative information has led the Court to its own difficult decision on this matter."

¶ 73　　　The trial court found the following:

"The Court is concerned as to the contentious and distrustful nature of the relationship between the parties in this matter. Both parents have made independent decisions on many issues, including counseling and education, without any consultation or cooperation with the other parent.

The Court therefore finds that it is in the best interests of the parties' chil[d] that the responsibility for significant decision-making for the area of education and health should be allocated to [Kassandra]. *** The responsibility for significant decision-making in the areas of religion and extracurricular activities are allocated

- 16 -

to the parties jointly."

¶ 74                    2. *Allocation of Parenting Time*

¶ 75        The trial court began its analysis of the factors for allocating parenting time by explaining that some of the factors overlapped and the court would not restate its prior analysis of those factors. As with the parental decision-making factors, the court concluded that the majority of factors were neutral or did not favor one party over the other. Of the factors that were not neutral, the court found that they weighed in favor of Kassandra.

¶ 76        The most significant factors to the trial court were (1) the amount of time each parent spent performing caretaking functions in the 24 months preceding the filing of the petition, (2) the course of conduct between the parents relating to caretaking functions with respect to the child, and (3) the willingness and ability of each parent to place the needs of the child ahead of his or her own needs. Regarding the 24 months preceding the filing of the petition, the court found, "This factor favors [Kassandra], as the Court finds [Kassandra] and other witnesses more credible in confirming that [Kassandra] spent more time performing caretaking functions with respect to K.M.Y." Regarding the course of conduct, the court concluded, "This factor favors [Kassandra], as she has had majority parenting time over the last year and there was sufficient evidence presented that she also performed the majority caretaking functions over the past 24 months."

¶ 77        Regarding each parent's ability to put the needs of the child before their own, the trial court found as follows:

> "As to [Charles], while this Court commends and values industriousness
> and productivity, there is a major credibility concern revealed by [Charles's] efforts
> to minimize his activities outside of parenting, particularly when it came to his
> efforts in the entertainment space. [Charles's] testimony was impeached by the

- 17 -

testimony of others and the exhibits presented which showed more extensive touring and scheduling demands than his own testimony presented regarding his entertainment career.

While both parents do seem to place significant time and attentiveness to the needs and care of K.M.Y., this factor favors [Kassandra]."

¶ 78　　　　After considering the statutory factors, the trial court concluded, "after consideration of the credibility of the parties, the evidence presented, *** and the best interests of K.M.Y., that [Kassandra] be awarded the majority of parenting time." The court allocated parenting time to Charles consistent with the agreed temporary order, that is, every Wednesday overnight and every other weekend. The court further ordered holidays and school breaks—including summer—be divided equally and the parties continue to use TalkingParents to communicate.

¶ 79　　　　This appeal followed.

¶ 80　　　　　　　　　　　　　　II. ANALYSIS

¶ 81　　　　Charles appeals, arguing the trial court's order was against the manifest weight of the evidence. Charles contends the court misconstrued the evidence regarding primary caretaking, particularly the evidence that Charles traveled for his music career in the years before the petition for dissolution was filed. Charles also asserts the trial court (1) under-emphasized Charles's willingness to foster a relationship between K.M.Y. and Kassandra and (2) discounted evidence that Kassandra had a pattern of actively interfering with K.M.Y.'s relationship with Charles. We disagree and affirm.

¶ 82　　　　　　　　　　　　A. The Standard of Review

¶ 83　　　　Sections 602.5(e) and 602.7(b) of the Illinois Marriage and Dissolution of Marriage

Act (Act) provide a list of factors for the court to consider when determining the best interests of the child. 750 ILCS 5/602.5(a), 602.7(a) (West 2020). Determining the allocation of parenting time and decision-making requires the trial court to consider the credibility of the testimony, weigh the evidence, and exercise its discretion to determine the best interests of the child. See *In re Custody of Sussenbach*, 108 Ill. 2d 489, 498-99, 485 N.E.2d 367, 370-71 (1985) ("[T]he trial court is in the best position to judge the credibility of the witnesses and determine the needs of the child."). "In child custody cases, there is a strong and compelling presumption in favor of the result reached by the trial court because it is in a superior position to evaluate the evidence and determine the best interests of the child." *Young v. Herman*, 2018 IL App (4th) 170001, ¶ 64, 92 N.E.3d 1070.

¶ 84　　　　　Accordingly, a reviewing court will not disturb a trial court's order allocating decision-making responsibilities or parenting time unless the court's findings are against the manifest weight of the evidence. *Jameson v. Williams*, 2020 IL App (3d) 200048, ¶ 47, 165 N.E.3d 501; *In re Custody of G.L.*, 2017 IL App (1st) 163171, ¶ 24, 80 N.E.3d 636. "Under the manifest weight standard, an appellate court will affirm the trial court's ruling if there is any basis in the record to support the trial court's findings." *G.L.* 2017 IL App (1st) 163171, ¶ 24; see also *Jameson*, 2020 IL App (3d) 200048, ¶ 47 ("A decision is against the manifest weight of the evidence when an opposite conclusion is apparent or when the court's findings appear to be unreasonable, arbitrary, or not based on evidence."). "It is well settled that a reviewing court's function is not to reweigh the evidence or assess witness credibility and set aside the circuit court's decision simply because a different conclusion may have been drawn from the evidence." *Id.* ¶ 51.

¶ 85　　　　　　　　　　　　　　　　B. This Case

¶ 86　　　　　Charles's arguments on appeal are largely identical to the ones he submitted to the trial court in his written closing arguments. As a result, his arguments largely amount to a *de facto*

request to reweigh the factors, evidence, and arguments considered by the trial court. To be sure, Charles argues in depth why he believes the opposite conclusion is clearly evident based on the evidence presented at the two-day hearing. Nonetheless, because (1) the trial court provided a detailed order explaining its reasoning and (2) the evidence presented supports that reasoning, we affirm.

¶ 87     Each parent claimed to be K.M.Y.'s primary caregiver between 2018 and 2021. Charles presented evidence that he was very willing to be flexible, compromise, and communicate with Kassandra in compliance with court orders to address the realities of co-parenting a thriving five-year-old. Kassandra presented ample evidence that she was the primary caregiver when K.M.Y. was an infant and since separating from Charles. The trial court explicitly found Kassandra and her witnesses more credible than Charles and his witnesses. See *Jameson*, 2020 IL App (3d) 200048, ¶ 50 (affirming trial court's decision because mother could not provide a compelling reason to second-guess the trial court's explicit finding that father was more credible).

¶ 88     On appeal, as in the trial court, Charles emphasizes Kassandra's withholding of parenting time and virtually any contact with K.M.Y. for four months in 2020. Kassandra also demonstrated a very rigid devotion to strictly following the agreed temporary court order in all situations. It is understandable that Charles claims that the trial court rewarded Kassandra for her generally obstinate approach to co-parenting. However, Charles's assessment does not negate the findings by the trial court that Kassandra and her witnesses were more credible when testifying about the relative amount of time each party spent taking care of K.M.Y. from her birth until the evidentiary hearing.

¶ 89     Charles also complains that the trial court erred by concluding that his testimony about his music career was inconsistent with the evidence Kassandra presented. He points out that

on cross-examination, Charles was asked about how often he toured in the two years before he filed a petition for dissolution; that time period encompassed July 2018 to July 2020, but Kassandra's impeachment evidence covered only 2017 to October 2018.

¶ 90        Charles's argument has some logical appeal but misses the point. The trial court explicitly discounted Charles's testimony and credibility for two reasons: (1) his "minimizing" of his musical career and (2) his failure to even attempt to substantiate the serious allegations he leveled against Kassandra. Nothing in the record contradicts the trial court's conclusion that Charles was minimizing the extent of his musical career. The mere fact that Charles attempted to minimize the frequency and duration of his touring would support the trial court's conclusion that he was misrepresenting his priorities, past or present, at the very moment when the court would be allocating parenting time.

¶ 91        In short, the very arguments Charles presents on appeal, even if this court were to find them compelling, are the same arguments he presented to the trial court. This court will not substitute its judgment for that of the trial court. The record amply supports the trial court's conclusions that Kassandra be allocated the majority of parenting time and significant decision-making responsibilities for health and education.

¶ 92        In closing, we commend the trial court for providing an extraordinarily comprehensive written order summarizing the evidence and detailing the court's reasoning as to each statutory factor set forth in sections 602.5 and 602.7 of the Act. The order provided valuable insight into the trial court's thought process, which assisted this court's review of that order. In particular, we laud the court for explicitly stating which witnesses it found credible, something this court has repeatedly praised and encouraged. See *People v. Carter*, 2021 IL App (4th) 180581, ¶ 68; *In re Ta. T.*, 2021 IL App (4th) 200658, ¶ 57.

## III. CONCLUSION

For the reasons stated, we affirm the trial court's judgment.

Affirmed.